**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

BENESSERE INVESTMENT GROUP, LLC,
and ARC GLOBAL INVESTMENTS II, LLC,

      Plaintiffs,

v.                                    Case No.: 1:24-CV-21104-RAR

ERIC SWIDER, ALEXANDER CANO, and
RENATUS ADVISORS LLC,

      Defendants.

_____/

## DEFENDANTS' MOTION FOR SANCTIONS

Defendants Eric Swider ("Swider"), Alexander Cano ("Cano"), and Renatus Advisors LLC ("Renatus") (collectively, "Defendants"), by and through undersigned counsel and pursuant to Federal Rule of Civil Procedure 11(c)(2) and 28 U.S.C. § 1927, hereby move to sanction Plaintiffs Benessere Investment Group, LLC ("Benessere") and ARC Global Investments II, LLC ("ARC II"), their attorneys, Antonio M. Hernandez, Jr., Kevin P. Jacobs, Sabrina Serber, Charles Brumby, and Jose Antonio Ortiz, and their law firm, Homer Bonner Jacobs Ortiz, P.A (collectively, "Plaintiffs").  In support thereof, Defendants state as follows:

## INTRODUCTION

Defendants have satisfied Rule 11's safe harbor provision by sending Plaintiffs a letter outlining the bases for sanctions 21 days ago, on March 28, 2025, and attaching this Motion.  *See* Fed R. Civ. P. 11(c)(2);  Rule 11 Advisory Comm. Note, 1993 Amends.  To date, Plaintiffs have neither withdrawn the allegations in their Amended Complaint nor narrowed the scope of this action.  For the reasons stated herein, filing and maintaining this action does not comport with the standards set forth in Federal Rule of Civil Procedure 11(b) or 28 U.S.C. § 1927.

*First*, it has become apparent that, before filing this lawsuit, Plaintiffs failed to invest any meaningful time or effort investigating its claims.  Plaintiffs' principal contention in this case is that Defendants allegedly removed documents from a password-protected account at Box.com ("Box Account") without authorization.  But, as Plaintiffs conceded to Magistrate Judge Louis, they did not even bother to check which, if any, documents had been improperly taken from the Box Account before filing suit.  Instead, Plaintiffs spent months forcing Defendants to expend untold resources attempting to prove a negative—that Defendants did not improperly access certain confidential documents that Plaintiffs refused to identify.  Experience has proven that Plaintiffs could have ascertained the relevant facts within a matter of hours simply by creating an

1

account activity log.  Yet, they refused and instead embarked on a fishing expedition that was calculated to harass Defendants and drain their resources.  Plaintiffs' failure to investigate their claims—and the many months of fishing that followed—constitutes the first of many sanctionable offenses by Plaintiffs over the course of this litigation.

*Second*, after the Court required Plaintiffs to produce an activity log (which they managed to do in less than a day), Plaintiffs continued to engage in sanctionable conduct by advancing frivolous claims based on manifest falsehoods.  The Box Account was the central drive for various entities and stored thousands of documents and communications that pertain and belong to Digital World Acquisition Corp. ("DWAC"), which Plaintiffs have since conceded Defendants were authorized to access.  Despite Plaintiffs' late revelation that Defendants downloaded only 21 documents during the relevant time period allegedly without authorization, Plaintiffs continued to maintain, falsely, that Defendants accessed "hundreds" of confidential documents without authorization.  (D.E. 41 ¶ 101.)  Plaintiffs' counsel knew, or at least should have known through the exercise of reasonable diligence, before filing suit, that Cano and Swider had *bona fide* access to the Box Account and accessed primarily DWAC-related documents.  At a minimum, Patrick Orlando ("Orlando") was well aware of these facts and such knowledge is imputed to Plaintiffs' counsel.  As such, Plaintiffs and their counsel filed this suit in bad faith and should be sanctioned. If, for some reason, Plaintiffs' counsel was not aware because Orlando was less-than-candid and truthful with them, then they failed to conduct that basic diligence on the front end, so that they could later plead deniability and ignorance as to that frivolousness on the backend.  That, too, is a sanctionable offense.  This litigation has never been about restoring control over the Box Account (that Plaintiffs now control) or documents (that Plaintiffs clearly possess); it is—and has always been—about a calculated effort to harass Defendants and tax their resources.

**Third**, now that the factual predicates of Plaintiffs' case have been exposed as falsehoods, they have begun abusing the discovery process in an effort to reinvent their case and manufacture new bases for their claims in an effort to keep discovery going.  Specifically, they now claim, via their November 22 production letter, that non-party Natalie Salume—Patrick Orlando's former assistant—downloaded files at the direction of Defendants without authorization.  This late-breaking narrative appears nowhere in Plaintiffs' Amended Complaint, and simple diligence by Defendants has already shown it to be no less frivolous than Plaintiffs' initial theories.  The vast majority of the documents in Defendants' control that Ms. Salume allegedly downloaded pertain to DWAC-related business.  Numerous communications also reveal that Orlando—ARC II's sole managing member and the driving force behind this action—either *shared* several "unauthorized" documents with Defendants or *instructed* Ms. Salume to retrieve "several" unauthorized documents on his behalf.  Again, these are facts that Plaintiffs could, should, and would have discerned, had they conducted even a modicum of diligence before filing this frivolous and retaliatory lawsuit.  Plaintiffs' late-breaking efforts to shift the narrative confirm that they filed this case in an effort to harass and to extract discovery that they might use in other litigations, where ARC II and Orlando are being sued for their violations of the securities laws.

**Fourth**, Plaintiffs' representations to the Court in this matter underscore their intention to weaponize this litigation as a means of securing discovery in other matters.  Specifically, Plaintiffs refused to enter into a protective order, insisting that they could use discovery obtained in this case in other actions.  Yet, those efforts were thwarted only once Magistrate Judge Louis intimated that she would oppose language permitting parties to use documents produced in this case in other actions.  (D.E. 56 at 8:3–23.)  Plaintiffs have also made factual claims in this litigation that conflict directly with claims they have made in other related cases.  For example, in this action, Plaintiffs

claim that the purported "scheme" to oust Orlando was designed to benefit Swider individually and his company Renatus.  Conversely, in the counterclaims filed in the Sarasota action before Judge Carroll, ARC II alleges that the "scheme" was initiated by Swider in his official capacity as CEO, that DWAC provided Swider with express authority to act on its behalf, and that Swider and Cano "stole" investor "contact information and confidential documents" to benefit the entity DWAC, not themselves individually.  Those material inconsistencies confirm that this case is not about the pursuit of truth, but rather the pursuit of discovery to be utilized in the Sarasota action before Judge Carroll.

*Fifth*, and finally, Plaintiffs have retained a forensics expert, Lawgical Insight, LLC ("Lawgical"), that they know was hired by DWAC in connection with the SEC investigation and has access to its confidential information.  This is unethical and a violation of Florida's Rules of Professional Conduct.  Fla. Bar Code of Prof. Cond. 4–1.6, 4–4.2, 4–8.4(d).  Sanctions are independently appropriate for this fifth reason.

## BACKGROUND

### I.     Plaintiffs' Manufactured Claims Against Defendants.

On March 21, 2024, Plaintiffs initiated this action arising from Defendants' purported computer hacking scheme aimed at "seiz[ing] control of and enlarg[ing] their holdings in" DWAC. (D.E. 1 ¶ 1; *see also* D.E. 41 ¶ 1.)  They maintain that, after the DWAC/TMTG merger in early 2023, Eric Swider (then a DWAC director) devised a scheme to oust Orlando as DWAC's CEO. (D.E. 41 ¶ 19.)  This scheme was allegedly designed to benefit Swider and his company Renatus, as Swider "stood to receive massive compensation previously unavailable to him."  (*Id.* ¶ 21.) Plaintiffs maintain that in carrying out his scheme, Swider allegedly "published false and misleading representations of what was occurring at DWAC to DWAC's directors and other individuals involved in DWAC's business." (*Id.* ¶ 19.)  According to Plaintiffs, Swider was

successful in his scheme; Orlando was removed as CEO of DWAC due to Swider's actions—*not* because of Orlando's securities violations, self-dealing, or mismanagement of DWAC. (*Id.* ¶ 22.)

Plaintiffs' principal submission is that, in order "to gain control of ARC II and complete his takeover of the entire DWAC enterprise," Swider recruited Cano to obtain confidential information about ARC II and its investors that was held by Benessere in the Box Account. (*Id.* ¶¶ 23–24.) At that time, Cano was allegedly employed as Orlando's assistant at Benessere and had login credentials to the Box Account, which stored "the lifeblood of Benessere's business, as well as that of ARC II and other entities for which Benessere provides consulting services." (*Id.* ¶¶ 24–26.) Cano allegedly agreed to conspire with Swider, left his employment with Benessere, and was installed as President and Secretary of DWAC in exchange for his promise to access and monitor the Box Account. (*Id.* ¶¶ 28–29.) Plaintiffs claim that Cano and Swider seized "hundreds" of confidential documents from the Box Account without authorization (*id.* ¶¶ 100–101), and that they further deployed that information to damage Plaintiffs (*id.* ¶¶ 23, 35, 41, 46).

Based on the foregoing allegations, Plaintiffs' Amended Complaint asserts thirteen statutory and common law causes of action. Through the Amended Complaint, Plaintiffs seek injunctive relief in the form of (1) enjoining Defendants from accessing Plaintiffs' computers and information, obtaining any proprietary information belonging to Plaintiffs, using any information acquired without authorization, and destroying and/or altering any documents relating to Plaintiffs; and (2) ordering Defendants to immediately return dominion over Plaintiffs' computer systems, disgorge all of Plaintiffs' information, and turn over any computers or other devices for independent forensic examination. (*Id.* at 27–28.) Plaintiffs also generally seek "damages, attorneys' fees, losses, and costs" (*id.* at 27), based on unspecified claims of "injury" and "harm" (*see, e.g.*, *id.* ¶¶ 2, 91, 93, 110, 117).

## II.     For Months, Plaintiffs Concealed the Factual Basis for Their Claims.

Plaintiffs' Amended Complaint alleges that Defendants downloaded "hundreds" of confidential documents without authorization.  (D.E. 41 ¶ 100–01.)  Even though that alleged conduct is at the center of this dispute, Plaintiffs refused to identify with specificity the relevant documents, even though they could easily have done so had the allegations been true.  (D.E. 56 at 70:16–71:4, 72:8–72:12; D.E. 60 at 13 n.6; D.E. 60-1 at 15–17.)  Plaintiffs controlled the Box Account at the commencement of this suit and, with minimal effort, could have produced an activity report showing which files were downloaded by Defendants.  (D.E. 60-1 at 15.)  But Plaintiffs refused.  And, for months, Defendants were forced to undertake excessive discovery to identify purely hypothetical documents that might have confidential information belonging to Plaintiffs in order to "prove the negative"—*i.e.*, that they were not in possession of these hypothetical documents.  (*See, e.g.*, D.E. 56 at 48:8–18.)  In total, Defendants were forced to search for four months before Plaintiffs would even consider identifying the basis for their claims.  (*See id.* at 70:16–71:4, 72:8–72:12.)

When the Court learned of Plaintiffs' limitless approach to discovery, he criticized Plaintiffs for mounting "discovery battles on a moving target" and seeking to expand their claims "through discovery." (D.E. 60-1 at 7–9, 18.)  Accordingly, the Court directed Plaintiffs to run and produce the activity report to the Defendants.  (*Id.* at 15, 19, 41.)  That following day, Plaintiffs produced a Box Account activity report for Swider and Cano from inception through April 1, 2024, and insisted that Defendants cull through 4,964 rows of data to identify all documents Defendants claim were accessed *with* authorization.  (Ex. A, SDFL24cv21104_Benessere_000001; *see* Ex. B, Correspondence from A. Hernandez to C. Oprison (Nov. 14, 2024).)  Notwithstanding Plaintiffs' insistence that Defendants bear the burden to disprove Plaintiffs' baseless allegations, Magistrate Judge Louis ordered Plaintiffs to identify "the specific documents" they claim Defendants

accessed without authorization and noted that this information should have been disclosed as part of Plaintiffs' initial disclosures.  (D.E. 53 at 3; *see also id.* at 2 n.3.)  It became apparent at the November 15 discovery hearing that Plaintiffs failed to go through that process before filing this action—a clear violation of counsel's obligations as officers of the court.  (*See* D.E. 56 at 70:25–71:1; 72:8–12 (conceding that counsel "just had a chance to carefully look at the full log with all the file paths" and that it would take approximately "a week" to identify the documents Defendants allegedly accessed without authorization).)

The activity report and subsequent identification of the "allegedly unauthorized documents" exposed Plaintiffs' suit for what it is—a frivolous, abusive suit and a red herring. Rather than turning up "hundreds" of confidential documents, Plaintiffs identified only 21 documents downloaded by Defendants without authorization, the vast majority of which pertain to DWAC.  (*See* Ex. C, November 20 Spreadsheet.[1])  In addition to identifying a materially false allegation, that revelation was fatal to Plaintiffs' claims because, as even Plaintiffs' counsel conceded, Swider and Cano had *bona fide* access to those documents, and accessing DWAC documents cannot possibly amount to a breach of fiduciary duty.  (*See* D.E. 46 at 56:1–22 ("[I]t could not be a breach of fiduciary duty to provide an DWAC document to Mr. Swider.").)  Had Plaintiffs investigated the factual basis for their claims, they would have recognized the claims had no factual basis or merit.

### III.  The Court Largely Dismisses Plaintiffs' "Kitchen Sink" Complaint, but Plaintiffs Replead It Anyway.

The Court also recognized that Plaintiffs' claims were indeterminate and undisciplined.

---

[1] On November 20, 2024, Plaintiffs produced a spreadsheet, entitled "List of Unique Downloaded Files by Cano, Swider, and Salume from 1-31-2023 to 4-1-2024 - 4862-3974-6045 - 1.xlsx", which identifies the documents allegedly downloaded by Swider, Cano, and Ms. Salume without authorization.  That spreadsheet is referred to as the "November 20 Spreadsheet".

On June 17, 2024, Defendants moved to dismiss Plaintiffs' initial Complaint in its entirety, which the Court granted in large part on October 31, 2024.  (D.E. 35.)  The Court dismissed two claims with prejudice and five claims without prejudice.  As to the latter, the Court stressed that several of the initial Complaint's "claims display[ed] signature elements of a shotgun pleading" by reincorporating all facts into each count and "reciting the elements [of the claims] without specifying what facts alleged meet each element."  (*Id.* at 13–14.)

Plaintiffs filed an Amended Complaint on November 12, 2024, that largely tracked the first one.  (D.E. 41.)  It asserted all of the counts preserved by the Court's order (*id.* ¶¶ 80–156, 172–77) and added two counts for conversion (*id.* ¶¶ 157–71).  The prayer for relief remained the same aside from removing a request for reinstated "dominion" over Plaintiffs' devices.  (*Compare* Compl. at 20, *with* Am. Compl. at 28.)  And the general allegations now included assertions of an unsuccessful attempt to replace Orlando as ARC II's managing member and lawsuits initiated by ARC II members allegedly instigated by Defendants' emails.  (D.E. 41 ¶¶ 47–60, 71, 73.)  At no point did the Amended Complaint tie those allegations to a particular claim, count, or request for relief.

On November 13, 2024, the Court held a status conference with the parties and criticized Plaintiffs for again over-pleading, calling the Amended Complaint a "kitchen sink situation." (D.E. 60-1 at 7.)  It chided them for *adding* claims instead of narrowing the complaint down to a few core counts.  (*Id.* at 23 ("My hope was to get this so focused so we would know exactly what remained.").)  And it confirmed that the only damages asserted in the Amended Complaint "were for the forensic expert that was brought in."  (*Id.* at 4.)  In particular, the Court did not find "anything [in the Amended Complaint] about valuation" of ARC II, "valuation of being locked out of the account for months," or "a valuation decline or an impact on the Benessere business."

(*Id.* at 5–6, 9.)  Recognizing that this case was being "over litigated," the Court issued Plaintiffs a sharp warning not to use this case as a "vehicle to obtain discovery for the litigation somewhere else" or to prosecute this case as "litigation for litigation's sake."  (*Id.* at 3, 7, 18.)  And the Court said, in no uncertain terms, that it was "*not going to allow* this to become or manufacture something on a valuation theory that's not here."  (*Id.* at 15 (emphasis added).)  The Court also made clear that the heart and soul of the case turns on whether or not Defendants unlawfully accessed the Box Account and removed documents they were not authorized to remove—*i.e.*, not DWAC-related documents which they decidedly *were* authorized to access, use, and remove.  (*Id.* at 19, 33.)

Accordingly, Defendants moved again to dismiss the Amended Complaint, arguing that it failed to state a claim under any of its counts and that many of those counts constituted shotgun pleadings.  (D.E. 60.)  Defendants contended that despite the Court's "clear instructions . . . on how to cure their fatal pleading deficiencies," the Amended Complaint still incorporated all facts into each count, "formulaically recite[d] the elements of" many claims, squeezed multiple violations into several counts, and grouped Defendants in various causes of action.  (*Id.* at 7–9, 11–13, 16–17.)  Defendants also showed, in line with the Court's findings at the November 13 conference, that the Amended Complaint wholly failed to allege damages (aside from the forensics expert cost) as a result of Defendants' purported conduct.  (*Id.* at 7–8, 10, 12, 14, 16.)  That motion is currently pending.

## **LEGAL DISCUSSION**

Plaintiffs' counsel should be sanctioned for failing to investigate the basis for its claims, making materially false representations of fact, willfully disregarding the Court's orders, taking patently inconsistent positions in two proceedings in a clear effort to fish for helpful discovery across the two cases, and retaining a conflicted expert.  All are sanctionable offenses.

Rule 11 provides for sanctions "(1) when a party files a pleading that has no reasonable factual basis; (2) when the party files a pleading that is based on a legal theory that has no reasonable chance of success and that cannot be advanced as a reasonable argument to change existing law; or (3) when the party files a pleading in bad faith for an improper purpose." *Worldwide Primates, Inc. v. McGreal*, 87 F.3d 1252, 1254 (11th Cir. 1996).  "[U]nder Rule 11, an attorney must make a reasonable inquiry into both the legal and factual basis of a claim prior to filing suit."  *Id.* at 1255.  In addition, 28 U.S.C. § 1927 provides for sanctions when an attorney acts in "bad faith" by, among other things, "knowingly or recklessly pursu[ing] a frivolous claim or engag[ing] in litigation tactics that needlessly obstruct the litigation of non-frivolous claims." *Lacayo v. Puerta de Palmas Condo. Ass'n Inc.*, 842 F. App'x 378, 382 (11th Cir. 2021).  An attorney may be sanctioned under Section 1927 when they "fail[] to follow the court's directions" and submit amended filings "without remedying the deficiencies that the [court previously] identified."  *Id.*; *see also Jackson v. Bank of Am., N.A.*, 898 F.3d 1348, 1358 (11th Cir. 2018) (imposing sanctions where counsel "fails to comply with the court's order").  Sanctions are also appropriate in situations where "a reasonable attorney would have dropped meritless claims and not persisted in litigation."  *Lacayo*, 842 F. App'x at 384; *see also Cook-Benjamin v. MHM Corr. Servs., Inc.*, 571 F. App'x 944, 949 (11th Cir. 2014).  Plaintiffs' conduct throughout this litigation is sanctionable under both Rule 11 and Section 1927.

I.    **Plaintiffs Failed to Investigate the Factual Basis of Their Claims and Made False Representations of Material Fact to the Court.**

It is well-settled that an attorney may be sanctioned for failing to "make a reasonable inquiry into" the "factual basis of a claim prior to filing suit."  *Worldwide Primates*, 87 F.3d at 1255.  That is precisely what transpired here.  Plaintiffs pled "an audacious scheme to seize control" of Benessere and ARC II and accused Cano of illegally accessing and downloading

"hundreds of files." (D.E. 41 ¶¶ 1, 101; *see also id.* ¶ 100 ("407 files").) Yet, they failed to make the most basic investigation into whether this allegation had a factual basis. After *four months* of discovery and eight months after the Complaint in this case had been filed, Magistrate Judge Louis asked point-blank where Plaintiffs were with identifying those documents which should have been "initial disclosures." (D.E. 56 at 70:22–70:24.) Even at that late stage, Plaintiffs' counsel still was unable to identify which documents were allegedly accessed without authorization and responded that he and the client would need "probably like a week" to review the list of documents. (*Id.* at 70:24–71:4, 72:8–12; *see also* Ex. B, Correspondence from A. Hernandez to C. Oprison (Nov. 20, 2024).)

Defendants provided Plaintiffs with ample notice that this concealment was improper. Defendants had "repeatedly" asked for an activity report. (D.E. 60-1 at 16.) Magistrate Judge Louis noted that Plaintiffs were required—yet failed—to share that information as part of their initial disclosures. (D.E. 53 at 2 n.3; *see also* D.E. 56 at 70:16–23.) The Court also recognized repeatedly that it would not be difficult to produce. It was "pretty clear" to the Court "there are easy ways to get a record" of activity on a Box Account, and he stressed that "it shouldn't be too hard for" Plaintiffs "to give a universe of what they believe was improperly taken." (D.E. 60-1 at 15.) Had Plaintiffs conducted a reasonable inquiry into the claims before filing suit, they easily could have determined how many documents were accessed and which were improperly obtained. But they did not make that inquiry—a sanctionable offense—so that they could propound months of aimless discovery against Defendants.

When Plaintiffs' counsel finally disclosed the specific documents allegedly downloaded by Defendants without authorization, it immediately became clear to Defendants why it had refused for so many months to identify which documents had been taken. Indeed, notwithstanding

the "407" documents alleged in the Amended Complaint, Plaintiffs identified *only 21 documents* downloaded by Defendants without authorization. (*Compare* D.E. 41 ¶ 100, *with* Ex. C, November 20 Spreadsheet.) What is more, the vast majority of the 21 were DWAC related documents, which even Plaintiffs' counsel has conceded Defendants had every right to access. (*See* D.E. 46 at 56:1– 22; *see also* D.E. 45 at 4.) Those "revelations" were fatal to *each* of Plaintiffs' claims, which are either premised on or have as an element "*unauthorized access*." (*See* D.E. 41 Counts I, IV–IX); 18 U.S.C. § 2701(a)(1) (SCA prohibiting access "without authorization"); 18 U.S.C. § 1030(a)(2)(C), (4), (5)(C), (6)(a) (CFAA prohibiting the same); Fla. Stat. § 668.803(1) (CADRA prohibiting obtaining information "without authorization").

Discovery in this action has also showed that this case has been predicated on concealment, dishonesty, and bad faith. Defendants' search for documents from November 1, 2022 through the present reveals that only seven (7) of those documents are in Defendants' possession, custody, or control. Additionally, five (5) of those documents squarely pertain to DWAC-related business, which Plaintiffs should have discovered by either reviewing the documents themselves or by simply reviewing the file path showing where the documents were stored. The most egregious example is "DWAC_-_Arc_-_Confidentiality_Agreement_(Investor). docx.pdf" (identified in Row 18 of the November 20 Spreadsheet), which is a Confidentiality Agreement dated June 14, 2021 and entered into between ARC, *DWAC*, and an investor. Notably, on the *same* day that Cano downloaded this document allegedly without authorization, Orlando himself emailed the document to Swider, Cano, Salume, and counsel for DWAC. (Ex. D, SWICAN-001-00002819.) These are facts Plaintiffs should have discovered through the exercise of reasonable diligence before filing suit.

Accordingly, despite Plaintiffs' insistence of wrongdoing and for broad discovery, this

action necessarily turns on two (2) documents that Defendants allegedly downloaded without authorization and used for some nefarious reason.  They have no proof of either.  (*See* Ex. E, SWICAN-001-00003690 (showing that on March 15, 2023, Cano sent Orlando the "BIG 4 Master Control WIP" spreadsheet via WhatsApp); Ex. F, SWICAN-001-00002967 (showing that the "Logins" spreadsheet was necessary to effectuate DWAC business and stored DWAC credentials).)  At a minimum, Orlando was well aware of these facts and such knowledge is imputed to Plaintiffs' counsel.  As such, Plaintiffs and their counsel filed this suit in bad faith and should be sanctioned.  If, for some reason, Plaintiffs' counsel was not aware because Orlando was less-than-candid and truthful with them, then they failed to conduct that basic diligence on the front end, so that they could later plead deniability and ignorance as to that frivolousness on the backend.  That, too, is a sanctionable offense.

As the backstory makes clear, this case has never reflected a genuine effort to regain control of the Box Account and recover stolen documents.  Plaintiffs' counsel has taken direction from an individual actor and principal of the Plaintiff entities who has, time and again, demonstrated an intrinsic aversion to truth, candor and integrity.  Plaintiffs could have easily discovered and then disclosed "a universe of what they believe was improperly taken" (D.E. 60-1 at 15), which would have significantly narrowed Plaintiffs' claims.  But they declined to do so.  In situations like these, "[a] 'motive to harass' can … be inferred from an attorney's filing of factually . . . frivolous claims."  *Cohen v. Burlington, Inc.*, No. 18-CV-81420, 2020 WL 1033349, at *8 (S.D. Fla. Mar. 3, 2020) (quoting *Thompson v. RelationServe Media, Inc.*, 610 F.3d 628, 665–66 (11th Cir. 2010) (Tjoflat, J., concurring in part)); *Worldwide Primates*, 87 F.3d at 1254 (recognizing that "[i]f the attorney failed to make a reasonable inquiry, then the court must impose sanctions despite the attorney's good faith belief that the claims were sound").  Because a reasonable inquiry would

have revealed that "factual contentions" of unauthorized access of hundreds of files have no "evidentiary support," and because Plaintiffs have prosecuted this action solely in an effort to harass, sanctions are appropriate under Rule 11(b)(3) and Section 1927.

## II.   Plaintiffs Have Repeatedly Flouted the Court's Instructions and Attempted to Improperly Expand the Scope of This Case Through Discovery.

The Court recognized that this case is being "over litigated," expressed dismay when Plaintiffs re-filed a virtually identical Amended Complaint with two additional claims, and cautioned Plaintiffs that this case should not be prosecuted as "litigation for litigation's sake." (D.E. 60-1 at 3, 7, 18).  Yet, despite the Court's admonition that this case be narrowed and focused, Plaintiffs have abused the discovery process in an effort to continue harassing Defendants and cure their baseless allegations in their Amended Complaint.  That is sanctionable conduct.  *See Illes v. Wilton Manors*, 654 F. Supp. 1212, 1216 (S.D. Fla. 1987) (imposing sanctions because "Plaintiff disobeyed the Court's instructions"); *DeSisto College, Inc. v. Line,* 888 F.2d 755, 763–64 (11th Cir. 1989) (upholding sanctions under Rule 11 against counsel who failed to follow court's explicit instructions); *SEC v. Complete Bus. Sols. Group, Inc.*, No. 23-11927, 2024 WL 125966, at *2 (11th Cir. Jan. 11, 2024) (upholding sanctions against counsel with "broad[] practice of ignoring the court's orders"); *MSPA Claims 1, LLC v. Liberty Mut. Fire Ins. Co.*, No. 17-22539-CV, 2025 WL 643208, at *4 (S.D. Fla. Feb. 25, 2025) (sanctions appropriate "for insisting upon a position after it is no longer tenable"); *Deer v. Saltzman, Tanis, Pittell, Levin & Jacobson, Inc.*, No. 10-61588-CIV, 2011 WL 1526829, at *6 (S.D. Fla. Apr. 1, 2011), *report and recommendation adopted*, 2011 WL 1532064 (S.D. Fla. Apr. 20, 2011) (imposing sanctions where "plaintiff failed to timely take corrective action as to" certain counts of an amended complaint).

**A.  Plaintiffs Pivot to a New Target: Natalie Salume.**

Throughout discovery, Plaintiffs have attempted to assert new claims and invent new factual theories to show unauthorized access by individuals other than Defendants.  Specifically, though it is never mentioned in the Amended Complaint, Plaintiffs now claim (without any proof) that non-party Natalie Salume downloaded thousands of files at the direction of Defendants without authorization.  (Ex. G, Benessere Resp. to Cano First Set of Interrogs. No. 3.)  But Plaintiffs fail to acknowledge a fact that was well known to them—Ms. Salume was *Orlando's former assistant* and worked and/or assisted him until late 2024, Ms. Salume downloaded numerous documents from the Box Account on Orlando's behalf, and several documents identified as downloaded by Ms. Salume largely concern DWAC and were, therefore, accessed with proper authority.  Thus, having failed to show that Defendants accessed any confidential information without authorization, Plaintiffs have pivoted to a new target in Ms. Salume—another alleged "double agent" working for Mr. Orlando.

Nonetheless, in an effort to put this issue to rest, Defendants searched for all documents identified as downloaded by Ms. Salume allegedly without authorization.  Defendants' analysis (again) revealed that Plaintiffs failed to failed to investigate the factual basis of their claims—only 398 documents are in Defendants' possession, custody, or control, and nearly *all* of those documents pertain to DWAC-related business.  Nor do Plaintiffs have any proof that a single document was downloaded by Ms. Salume on Defendants' behalf or that they are "unauthorized" documents in any way.  In fact, numerous communications reveal that: (1) Orlando himself shared several "unauthorized" documents with Defendants, among others (*see, e.g.*, Ex. H, SWICAN-001-00003855, Ex. I, SWICAN-001-00003817); (2) Orlando instructed Ms. Salume and Cano to retrieve several "unauthorized" documents on his behalf (*see, e.g.*, Ex. J, SWICAN-001-00002734, Ex. K, SWICAN-001-00002713); and (3) several "unauthorized" documents were sent to

Defendants and/or Orlando by third parties and not retrieved from the Box Account (*see, e.g.*, Ex. L, SWICAN-001-00003839, Ex. M, SWICAN-001-00003043).

Additionally, it is also concerning that included in the list of documents downloaded by Ms. Salume are numerous screenshots of websites and other publicly available information that do not and cannot amount to "confidential" information belonging to anyone, let alone Plaintiffs. Notably, a total of 296 documents identified as downloaded by Ms. Salume were not even designated by Plaintiffs as "CONFIDENTIAL" pursuant to the parties' Confidentiality and Protective Order entered by the Court on November 7, 2024 (D.E. 40) ("Protective Order"). Plaintiffs effort to cure this glaring error by now claiming that the "*compilation* of [the] public information . . . was not public" fails.  (Ex. N, ARC II Resp. to Cano's First Set of Interrogs. No. 2.)  That is not what is alleged in the Amended Complaint.  (*See, e.g.*, D.E. 41 ¶¶ 23 ("Swider sought to obtain confidential information about ARC II and its investors"), 34 ("Cano without authorization accessed files . . . containing all information with regard to all investors as well as all financial and other confidential information not only of ARC but also of Benessere").)  Even if it was, this is not a trade secrets case. *See New Lenox Indus., Inc. v. Fenton,* 510 F. Supp. 2d 893, 908 (M.D. Fla. 2007) ("[T]orts involving the same underlying factual allegations as a claim for trade secret misappropriation will be preempted by FUTSA").

These are facts that Plaintiffs could, should, and would have discerned, had they conducted even a modicum of diligence before filing this frivolous and retaliatory lawsuit.  These late-breaking efforts to shift the narrative confirm that Plaintiffs filed this case in an effort to harass and to extract discovery that you might use in other litigations, where ARC II and Orlando are being sued for their violations of the securities laws.

**B. Plaintiffs Late and Deficient Attempt to Recover Hundreds of Thousands of Dollars in Legal Fees from Defendants.**

Plaintiffs have expanded their claims in another way: by interposing new and unpled damages theories.  At the status conference following the filing of Plaintiffs' Amended Complaint, the Court told Plaintiffs how it saw the scope of the case:  It is about "shutting down access by Swider and Alexander Cano" and "making sure that they've given back everything that they purportedly took."  (D.E. 60-1 at 8.)  It found that the Amended Complaint did not plead damages beyond forensics costs, and, in particular did not allege a valuation decline in Benessere's business as a result "of being locked out" of the Box Account.  (*Id.* at 4, 7, 9–10.)  The Court emphatically declared it was "*not going to allow* this to become or manufacture something on a valuation theory that's not here" nor allow Plaintiffs to "joy ride on this thing and drum up the costs."  (*Id.* at 15 (emphasis added).)  And the Court gave very specific instructions for the remainder of the litigation: "[F]igure out what it is that was taken and not taken, give [Defendants] a forensic report, figure out what needs to be returned, if anything at all and move from there."  (*Id.* at 19.)  Anything beyond that, it said, "is red herring stuff."  (*Id.*)  Simple enough.

But Plaintiffs ignored the Court's instructions by conceiving new and expanded damages theories.  Specifically, for the first time in discovery, Plaintiffs claimed that Defendants' access to and use of the information in the Box Account somehow "foment[ed] litigation against ARC II for which ARC II has incurred hundreds of thousands of dollars in legal fees and settlements."  (Ex. G, Benessere Resp. to Cano's First Set of Interrogs. No. 13; Ex. N, ARC II Resp. to Cano's First Set of Interrogs. No. 2.)  Likewise, Benessere has claimed for the first time in discovery it could somehow recover "the profits that Cano obtained from Swider and Renatus" and "may" seek punitive damages, despite never mentioning such damages in its complaint.  (Ex. G, Benessere Resp. to Cano's First Set of Interrogs. No. 10.)  And Benessere contends that some ARC II

members "were unwilling to enter into other transactions presented to them by Benessere" because of Defendants' conduct (*id.*), another claim completely and conspicuously absent from the Amended Complaint.

Plaintiffs' late-breaking efforts to improperly expand the scope of their claims also permeated its response in opposition to Defendants' motion to dismiss.  Indeed, after the Court stated that the Amended Complaint did *not* plead damage related to a temporary lockout, Plaintiffs claimed that "the value of the stolen data *cannot be denied*."  (D.E. 61 at 1; *see also id.* at 17 (claiming damages for "loss of use" of the Box Account documents).)  What "cannot be denied" is the fact that the Court wanted this case narrowed, and Plaintiffs explicitly flouted that order by creating theories not in the Amended Complaint.  Plaintiffs' efforts to expand the scope of their claims through discovery are directly contrary to the Court's clear directive to narrow the ground of dispute.  They also reflect an improper attempt to amend the complaint without asking for leave in violation of Federal Rule of Civil Procedure 7(b), *Rosenberg v. Gould*, 554 F.3d 962, 967 (11th Cir. 2009), and an abuse of the discovery process, *Liese v. Indian River Cnty. Hosp. Dist.*, 701 F.3d 334, 355 (11th Cir. 2012).

## III.    Plaintiffs Have Played Fast and Loose with the Truth to Gain a Litigation Advantage.

Plaintiffs have also abused the litigation process by advancing opposite factual theories in different fora, choosing whichever version best suits their particular case.  As the Court is aware, currently pending in Sarasota County are claims against ARC II and Orlando, among others, arising from their fiduciary breaches to DWAC.  *See Trump Media & Tech. Grp. Corp., et al. v. ARC Glob. Invs. II LLC, et al.*, No. 2024 CA 001061 (Fla. 12th Jud. Cir. Ct.).  On October 15, 2024, ARC II filed Counterclaims in the Sarasota Action that necessarily overlap with the claims alleged in this action but advance *materially inconsistent* theories of liability.  (*See id.* at DIN 231.)  For example, while Orlando, through ARC II and Benessere, claim here that the purported

"scheme" to oust Orlando was designed to benefit Swider individually and his company Renatus (D.E. 41 ¶ 21), Orlando, through ARC II, contends in the Sarasota Action that the purported "scheme" was initiated by Swider in his official capacity as CEO, that DWAC provided Swider with express authority to act on its behalf, and that Swider and Cano "stole" investor "contact information and confidential documents" to benefit DWAC. *See Trump Media & Tech. Grp. Corp.*, No. 2024 CA 001061, DIN 231 at ¶¶ 15, 47–48, 58–62, 73–74, 96–97, 113–114. Put otherwise, "[e]ither plaintiffs' counsel violated Rule 11(b)(3)" here by claiming that Swider was acting to enrich himself, "or counsel violated Rule 11(b)(3)" in the Sarasota Action by asserting that Defendants were working on DWAC's behalf. *Polar Int'l Brokerage Corp. v. Reeve*, 196 F.R.D. 13, 18 (S.D.N.Y. 2000). The Court should sanction Plaintiffs for lack of candor and misleading at least one court, and, in doing so, abusing the court process in both fora.

## IV.     Plaintiffs Knowingly Retained a Conflicted Expert.

The rules of professional responsibility impose clear restrictions on a plaintiff's right to engage with an expert that has been hired by his adversary. Plaintiffs' counsel has flouted that bedrock principle. (*See* Ex. G, Resp. to Cano's First Set of Interrogs. at No. 9.) Plaintiffs and their counsel are aware that DWAC engaged Lawgical in connection with the SEC investigation into Orlando's illegal activities, and they are now using that conflicted "forensic expert" to investigate claims and seek damages against Defendants in support of their baseless theories concerning their motives in obtaining roles within DWAC. That is unethical and sanctionable.

Under the Florida Bar's Code of Professional Conduct, lawyers cannot work with an expert witness "who was privy to confidential and proprietary information belonging to" their adversaries. *Rentclub, Inc. v. Transamerica Rental Fin. Corp.*, 811 F. Supp. 651, 654 (M.D. Fla. 1992), *aff'd*, 43 F.3d 1439 (11th Cir. 1995), *abrogated on other grounds by H.B.A. Mgmt., Inc. v. Estate of Schwartz*, 693 So. 2d 541 (Fla. 1997). To do so would violate numerous provisions of

the Code, including:

> (a) Fla. Bar Code of Prof. Cond., 4–1.6, which requires attorneys to maintain confidentiality and imposes upon attorneys a correlative duty to refrain from inducing others to disclose confidential matters;

> (b) Fla. Bar Code of Prof. Cond., 4–4.2, which prohibits attorneys from directly communicating with adverse parties, including employees of the corporate parties represented by counsel; and

> (c) Fla. Bar Code of Prof. Cond., 4–8.4(d), which prohibits attorneys from engaging in conduct that is prejudicial to the administration of justice.

*Id.* Courts may sanction attorneys for violating Rules of Professional Conduct. *See In re Finkelstein*, 901 F.2d 1560, 1564 (11th Cir. 1990). At the very least, Plaintiffs' counsel should not be permitted to seek damages (the only damages the Court has recognized) for its decision to conscript a conflicted expert. *See Goldman v. Bracewell & Patterson, L.L.P.*, 2005 WL 5960357, at *1 (M.D. Fla. May 9, 2005). There is no dispute that DWAC "had a confidential relationship" with Lawgical and DWAC "disclosed confidential information to" Lawgical. *Id.* Thus, sanctions are appropriate for Plaintiffs' retention of a conflicted expert.

## CONCLUSION

For all of the foregoing reasons, the Court should impose monetary sanctions on Plaintiffs and their counsel to compensate reasonable costs and attorneys' fees incurred in connection with responding to this frivolous action and grant such other relief that the Court deems just and proper.

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(a)(2)

The undersigned certifies that on April 18, 2025, counsel for Defendants conferred by Teams videoconference with counsel for Plaintiffs in a good faith effort to resolve the issues raised in this Motion. Counsel for Plaintiffs oppose the relief sought herein.

## **REQUEST FOR HEARING**

Pursuant to Local Rule 7.1(b)(2), Defendants respectfully request that the Court schedule a hearing on the instant Motion, which is estimated to require approximately one hour, to assist the Court in determining that sanctions are appropriate.

Dated: April 18, 2025

Respectfully submitted,

**DLA PIPER LLP (US)**

*/s/ Christopher G. Oprison*
Christopher G. Oprison (FBN 122080)
chris.oprison@dlapiper.com
Tal Aburos (FBN 1010901)
tal.aburos@dlapiper.com
200 South Biscayne Boulevard
Suite 2500
Miami, Florida 33131
Tel: (305) 423-8522
Fax: (305) 657-6366

*Attorneys for Defendants Eric Swider, Alexander Cano, and Renatus Advisors LLC*

<u>**CERTIFICATE OF SERVICE**</u>

**I HEREBY CERTIFY** that on April 18, 2025, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record via transmission of Notice of Electronic Filing generated by CM/ECF.

*/s/ Christopher G. Oprison*
Christopher G. Oprison
