# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### Miami Division

Case No.: 1:24-cv-21104-RUIZ/LOUIS

BENESSERE INVESTMENT
GROUP, LLC, and ARC GLOBAL
INVESTMENTS II, LLC,

      Plaintiffs,

v.

ERIC SWIDER, ALEXANDER
CANO, and RENATUS
ADVISORS, LLC,

      Defendants.

_____/

## PLAINTIFFS' OPPOSITION
## TO DEFENDANTS' MOTION FOR SANCTIONS



Kevin P. Jacobs
Antonio Hernandez
Jose A. Ortiz
Charles Brumby
Sabrina Serber
*Attorneys for Plaintiffs*
1200 Four Seasons Tower
1441 Brickell Avenue
Miami Florida 33131

1

## **Table of Contents**

I.    Legal Standards ................................................................................................................. 1

II.   Background ........................................................................................................................ 2

  A.   Presuit investigation............................................................................................................ 2

  B.   Plaintiffs regain control, but Defendants continue their wrongful conduct...................... 3

  C.   Discovery commences, and Defendants withhold critical discovery. ............................... 4

  D.   Defendants admit they improperly took control of the computer systems. ...................... 5

  E.   Discovery confirms Swider knew he was not acting on DWAC's behalf. ........................ 7

  F.   Discovery production confirms malfeasance..................................................................... 7

  G.   Discovery production confirms Swider orchestrated the ARC II mutiny........................... 8

  H.   Natalie Salume worked for Swider and sought to leverage the Box Account.................... 9

III.  Argument .......................................................................................................................... 11

  A.   The Motion fails on the merits......................................................................................... 11

  B.   Defendants failed to comply with the procedural requirements of Rule 11. ................... 19

  C.   Plaintiffs should be awarded their fees. .......................................................................... 19

IV.   Conclusion ....................................................................................................................... 20

Plaintiffs Benessere Investment Group, LLC ("**Benessere**") and ARC Global Investments II LLC ("**ARC II**") respond to Defendants' Motion for Sanctions (ECF No. 82; the "**Motion**"). The Motion is a blatant intimidation tactic. As shown below, Defendants knowingly and for improper purposes accessed Plaintiffs' computer systems without authorization, took and used documents and information that did not belong to them to advance their plot to seize control of ARC II and benefit themselves, including by diverting ARC II's investors to Defendant Renatus. The evidence uncovered *so far* not only supports the filing of this action but also supports Plaintiffs' forthcoming summary judgment motion. The baseless Motion should be denied and fees awarded to Plaintiffs.

## I. Legal Standards

Rule 11 motions are and should be rare, and "[t]he burden required to impose sanctions under Rule 11 is steep . . .." *PNC Bank, N.A. v. Rickenbacker Marina, Inc.*, 2025 WL 373108, at *5 (S.D. Fla. Jan. 30, 2025) (quotation omitted). To impose Rule 11 sanctions, the movant must demonstrate that the pleading or other document "(1) has no reasonable factual basis; (2) is based on a legal theory that has no reasonable chance of success and that cannot be advanced as a reasonable argument to change existing law; and (3) is filed in bad faith for an improper purpose." *Bigford v. BESM, Inc.*, 2012 WL 12886184, at *1 (S.D. Fla. Oct. 12, 2012) (quoting *Baker v. Alderman*, 158 F.3d 516, 524 (11th Cir. 1998)). The inquiry under Rule 11 is "whether the party's claims are *objectively* frivolous" and "whether the person who signed the pleadings should have been aware that they were frivolous." *Baker*, 158 F.3d at 524 (emphasis added). "If the claims are not objectively frivolous, then sanctions cannot be imposed under Rule 11." *PNC Bank*, 2025 WL 373108, at *5. "In practical terms, Rule 11 sanctions are not warranted unless a party demonstrates a 'deliberate indifference to obvious facts,' not when the evidence is perceived as merely weak." *Id.* at *6 (quoting *Benavides v. Miami Atlanta Airfreight, Inc.*, 612 F. Supp. 2d 1236, 1239 (S.D.

Fla. 2008)). "Rule 11 motions should not be employed to test the legal sufficiency or efficacy of the allegations made in a complaint." *In re Worldspan Marine Inc.*, 2022 WL 16701245, at *6 (S.D. Fla. Oct. 15, 2022). "All doubts as to whether Rule 11 has been violated should be resolved in favor of the party who signed the pleading." *Great Lakes Reinsurance (UK) PLC v. Blue Sea, LLC*, 2006 WL 2471522, at *9 (M.D. Fla. Aug. 24, 2006) (citation omitted).

Sanctions under 28 U.S.C. § 1927 are similarly rare. To be subject to section 1927 sanctions, "an attorney must [1] engage in unreasonable and vexatious conduct; [2] this conduct must multiply the proceedings; and [3] the amount of the sanction cannot exceed the costs occasioned by the objectionable conduct." *Schwartz v. Millon Air Inc.*, 341 F.3d 1220, 1225-26 (11th Cir. 2003). "If one factor is missing, sanctions cannot be imposed." *Macort v. Prem, Inc.*, 208 F. App'x 781, 786 (11th Cir. 2006).

Defendants' Motion must be denied because it fails to satisfy even one, much less all, of the elements required for sanctions under Rule 11 or section 1927.

## II. Background

### A.    Presuit investigation.

In early 2023, Defendants Swider and Cano hijacked and pilfered certain computer systems belonging to Plaintiffs, including the Box Account (as defined in the Motion). Defendants accessed Plaintiffs' confidential and vital business records and, among other things, used the information to contact ARC II members in a plot to oust Orlando as ARC II's managing member and seize control of the company. In mid-March 2024, Plaintiffs engaged Homer Bonner and Lawgical Insight to regain control of the Box Account and other computer systems. Plaintiffs needed urgent help and hired Lawgical because it had previously performed data collection work on Plaintiffs' systems and was familiar with them. Plaintiffs learned that (1) they could not access the Box Account activity reports, (2) one or more Defendants had access to numerous password files belonging to

Plaintiffs, and (3) Orlando could not log in to the Box Account. Unable to regain access through technical means, Plaintiffs filed this action seeking to regain exclusive access, for other injunctive relief, and for damages. Discovery has validated the decision to sue.

**B.     Plaintiffs regain control, but Defendants continue their wrongful conduct.**

This lawsuit did not immediately halt Defendants' misconduct. The day Plaintiffs filed suit, Defendants—using contact they took from the Box Account—emailed ARC II's members in furtherance of the conspiracy to seize control of ARC II. *See* ECF No. 41-1. Defendants' tortious interference with ARC II's members enjoyed early success. Five days after Plaintiffs filed this suit and Defendants sent the email, 23 ARC II members sued in Delaware's Court of Chancery to enforce a purported vote ousting Orlando as Manager. *Aaron Leon, et al. v. Patrick Orlando*, 2024-0311-LWW (Del. Ch. Mar. 26, 2024); DIN 1.

That same day, Plaintiffs' counsel sent Defendants a cease-and-desist letter demanding access to and the return of information taken from Plaintiffs' computer systems. Ex. A. Swider responded immediately, insisting that counsel drop this case:

> As you may be aware, Mr. Orlando was voted out as managing member of ARC and has been replaced by Gregg Alger [sic]. It is my understanding that only Mr. Alger [sic] at this point has authority to direct the actions of ARC. Please let me know if you need Mr. Alger's [sic] contact information so that your firm can take proper direction from someone with authority to speak for ARC and I will be more than happy to get that for you.

Ex. B. None of this was true, and Swider has never been an ARC II member. Orlando Decl. (Ex. C) ¶ 3. It was not until a week after Swider's misleading email and Defendants' failure to comply with the cease-and-desist letter that Plaintiffs finally regained administrative control of the Plaintiffs' computer systems.

Defendants' successful use of Plaintiffs' electronic data was fleeting, however. The Delaware court entered a status quo order on April 11, 2024 affirming that Orlando "shall be the sole

Manager and/or Managing Member of ARC with full authority to act on ARC's behalf. Plaintiffs, including Gregg Alper, shall not attempt to act on behalf of ARC." Status Quo Order, *Aaron Leon et. al. v. Patrick Orlando*, 2024-0311-LWW (Del. Ch. April 11, 2024); DIN No. 75. On August 1, 2024, the Delaware plaintiffs dropped their suit, which Defendants here instigated, but not until after ARC II had incurred hundreds of thousands of dollars in legal fees. Ex. D at Interr. No. 4.

### C.   Discovery commences, and Defendants withhold critical discovery.

Defendants have aggressively fought against producing documents and information. In July 2024, Plaintiffs served discovery requests and made their initial disclosures, which disclosed the retention and use of Lawgical. Pls.' Initial Discl. at 3 (Ex. E). Defendants broadly objected to Plaintiffs' discovery requests. After a November 1, 2024 discovery hearing, the Court found, "Nearly all of Defendants' responses objected to Benessere's discovery requests on the grounds that such requests were 'overly broad,' 'unduly burdensome,' 'irrelevant,' and 'not proportional to the needs of the case'," and that "[e]ach time these objections were invoked, they were nonspecific and unsupported." ECF No. 48 at 2-3. The Court ordered Cano to review "documents or electronically stored information that may refresh Cano's recollection as to whether he directed others to access or share information from the Box Account" and overruled his objections to Interrogatory No. 4 which sought information regarding whether Cano had directed others to access or share information from the Box Account and if so, to describe the circumstances surrounding each time he directed others to access the Box Account. *Id.* at 3. The Court also ordered Cano to answer an interrogatory: "Describe in detail how you came to have access to the Box Account . . .." *Id.* at 4. The Court found further that Cano "failed, however, to answer any part of the interrogatory" and that Cano "fail[ed] to adhere to the Local Rules." *Id.* at 4-5.

Two weeks later, the Court held another hearing on Defendants' discovery objections, ECF No. 49, and compelled Defendants to produce "documents they obtained from the Box Account after January 30, 2023," overruling objections based on purported burden. ECF No. 53 at 1.

Defendants then tried an expedited motion to stay discovery based on the pending motion to dismiss. ECF No. 65. Less than 24 hours later, Judge Ruiz denied the stay motion. ECF No. 67.

Discovery disputes continued. Following a February 27, 2025 hearing, the Court compelled Defendants to produce all communications with ARC II members and investors who received the email attached as Exhibit A to the Amended Complaint and required Defendants to explain "their efforts (and success or failure) to collect responsive documents by using recipient/sender names as ESI search parameters." ECF No. 74.

### D.     Defendants admit they improperly took control of the computer systems.

The hard-fought battles to pry discovery from Defendants have proved worthwhile. For example, Swider has now admitted that he "directed" Cano and "Salume to access information in the Box Account;" that "he did not perform work on behalf of or for the benefit of Benessere;" and that he "directed" Cano "to change the billing information associated with the Box Account to reflect Swider's credit card information." Swider's Answer to Pls.' Interrog. 4, 11-13 (Ex. F).

But while Swider swore that Cano, at Orlando's direction, provided him access to the Box Account "in approximately December 2021," Ex. F at Interrog. 7, the Activity Log and recently produced documents prove otherwise. Well over a year later, on March 22, 2023, Box emailed Swider with the subject line "Eric Swider, Your Benessere Investment Group Admin created a Box account for you." *See* Bates-stamped documents (leading zeros omitted), sequentially attached as Ex. G, at SWICAN-1-2045. Immediately after this email, Cano wrote Swider, "Check dwac email, you should have full access to Box account now." SWICAN-6-4849.

Just before that email, Swider had asked Cano, "Also can you send me my access to the box account?" to which Cano responded "I can get you access to Box. The emails is an issue as everything is tied to [Orlando's] gmail. *I have a password file from last year*. Do you have a good tech person?" SWICAN-6-4848 (emphasis added). Several days earlier, a former Benessere employee sent Cano a WhatsApp message, saying, "Search your email for logins real quick and see what pops up. My boxaccess or box all together is gone" and that "Apps4rent was the company that did all email. Search your email for *patslogins*." SWICAN-6-4917. Renatus, too, was involved, as Swider routed emails from the Box Account to his Renatus email. SWICAN-1-2043.

Cano's interrogatory responses inculpate both Swider and Cano. Cano swore that he "stopped working for Benessere in March of 2023, when Benessere refused to pay [him] his full monetary salary and when [he] was appointed as President of DWAC." Cano's Answer to Pls.' Interrog. 11 (Ex. H). Cano admitted that two months after he left Benessere, he "changed the access rights for the Box Account on May 18, 2023, to remove Patrick Orlando as an authorized user." Ex. H at Interrog. 14. He did so "by navigating through the administrative portal on Box.com" and "communicated with Eric Swider about disabling Patrick Orlando's access." *Id*. at Interrog. 20.

Cano conceded that he "changed the access rights for the DocuSign account in approximately March of 2023 to remove Patrick Orlando as an authorized user" and "also changed the billing information associated with the DocuSign account to reflect Eric Swider's credit card information." *Id.* at Interrog. 18. He also admitted he was rewarded for this scheme. After Cano's employment with Benessere was terminated, he "was thereafter compensated by DWAC in the amount of approximately $10,000 per month" and "received 165,500 Class A shares" in "approximately June 2024." *Id*. at Interrog. 15. Cano claimed he "did not receive any other

compensation from Renatus Advisors, LLC, Renatus LLC, or Eric Swider." *Id.* at Interrog. 16. But this appears untrue, as Renatus apparently issued Cano a $120,000 loan. SWICAN-6-4846.

### E.   Discovery confirms Swider knew he was not acting on DWAC's behalf.

While Swider now says that his actions were taken on behalf of DWAC and that ARC II's business is DWAC's business, he has contradicted this at other times. *E.g.*, SWICAN-1-585 (discussing ARC II subscription agreement and admitting "this is not a DWAC issue"). Shortly after taking over the Box Account and before changing the payment method without authorization, Swider emailed Cano that Benessere "should still be paying for" the Box, Docusign, and other items and noted, "[w]e may redo that contract and shift those expenses to Renatus." SWICAN-1-2023. Swider also advised ARC II members that he was "happy to get on a call to be supportive" but disclaimed DWAC's involvement, noting "in no way can DWAC be involved in discussions related to investments made into the sponsor of DWAC," and "DWAC does not and cannot endorse any . . . investment agreements between the sponsor and individuals." SWICAN-9-6659.

### F.   Discovery production confirms malfeasance.

Swider created a WhatsApp chat group for himself and 23 ARC II members, using contact information from the Box Account. SWICAN-9-7912. On April 26, 2023, he invited ARC II members to a Zoom conference using email addresses from the Box Account. SWICAN-8-6507. Many of those Swider invited to the Zoom conference later sued ARC II in the ill-fated attempt to take control of the company. Swider carefully omitted Orlando, Orlando's wife, and other ARC II members he presumably thought would be unwilling to join the conspiracy. *See* SWICAN-8-6507.

From what Defendants have been compelled to produce so far, it is apparent that from May 2023 through March 2024, Swider repeatedly solicited investments from ARC II's members through Renatus, diverting those investments from Plaintiffs. *See* Ex. G at SWICAN-8-5591, SWICAN-8-5607, SWICAN-8-5711, SWICAN-8-5998, SWICAN-9-7049, SWICAN-9-7078-81;

Ex. C ¶¶ 5, 7. Cano also solicited investments on behalf of Renatus. *See* Ex. G at SWICAN-9-6725, SWICAN-9-9265-66.

###### G.     Discovery production confirms Swider orchestrated the ARC II mutiny.

On March 1, 2024, Swider told ARC II members that he has "two hats in this fight. One as dwac ceo and *one as a B share holder*" and then proceeded to provide advice. SWICAN-9-8060 (emphasis added). Swider went on to misrepresent that he was part of ARC II and to sew dissent, stating, "B shareholders have an obligation to vote for any merger approved by the board. So the *fact that we, the sponsor*, have refused to vote on the merger, despite the contract, until such time that we get better economics may put us at risk of liability." SWICAN-9-8060-61 (emphasis added). Swider explicitly lied when he said, "*As a B shareholder* I am now seeking to remove our manager, Mr Orlando." SWICAN-9-8061 (emphasis added). One ARC II member asked, "As a b share holder can I help remove as well ?" Swider responded, "Yes. I am going to ask everyone to support the vote." SWICAN-9-8061. Swider also told ARC II members, "It is my believe he has breached his fiduciary responsibility." SWICAN-9-8061. He continued: "He has been out to self-deal since day one. *I am only saying this as a B shareholder*." SWICAN-9-8062 (emphasis added). After an ARC II member expressed confusion about whether the vote concerned the merger or removal of the manager, Swider replied, "However Any member of arc can. Vote to remove the manager." SWICAN-9-8062. Swider even lied to the ARC II members, suggesting they could be on the hook for $100 million in liability to DWAC, while again falsely suggesting he was an ARC II member rather than an officer of DWAC and a member of the DWAC board: "Now dwac board is seeking in excess of $100mm *from us*, the sponsor." SWICAN-9-8063 (emphasis added).

That same day, Swider told Alper that Orlando "cannot vote in a motion to remove him as manager." SWICAN-9-8070. Alper inquired, "So the plan is to have the other 68% vote him out?"

SWICAN-9-8071. He also asked, "Taking this from Scott Thomas, would it make sense for the Class B shareholders to sue Patrick personally?" SWICAN-9-8071.

On March 6, 2024, an ARC II member and plaintiff in the Delaware lawsuit against ARC II asked Swider, "Also, what are the lawyers I should copy, can you send email addresses? Do you know what lawyer represents ARC?" He then explained that he was "finalizing default notice." SWICAN-9-9112. Swider responded, "Have a call in 5 to find out." SWICAN-9-9112.

On March 14, 2024, Swider texted the same ARC II member, "We had someone inside Patrick's home tonight. friendly. Good intro collected Good intel." SWICAN-9-9113. The ARC II member replied, "We should hire PI to follow him around." SWICAN-9-9113.

On March 26, 2024, ARC II and Orlando were sued by some of the ARC II members on the chat initiated by Swider. Am. Compl.; SWICAN-9-7912. That lawsuit was, in the words of the plaintiffs' lead lawyer, "frivolous at best," *Aaron Leon, et al. v. Patrick Orlando*, 2024-0311-LWW (Del. Ch. Mar. 26, 2024) DIN 234, and was eventually dismissed, but not before ARC II incurred hundreds of thousands of dollars in attorney fees. Those same plaintiffs subsequently initiated additional litigations against ARC II in which they are represented by the same counsel that represents Swider and Cano, causing ARC II to incur further fees.

**H.  Natalie Salume worked for Swider and sought to leverage the Box Account.**

On May 26, 2023, Salume told Cano, "Just signed the agreement with Eric," to which Cano responded, "Good morning. Is it executed? You want to start now? Email is working right?" Salume replied, "yess executed" and "email is working." SWICAN-6-4862. On June 7, 2023, Salume sent Cano three documents from the Box Account. SWICAN-1-3579-604. Those documents included confidential business information about other business deals. SWICAN-1-3579-604; Ex. J. On July 21, 2023, Swider responded to an ARC II investor from his Renatus email, advising that Salume "works for us" in response to an email from an ARC II investor who

asked, "Is this legitimate?" because the investor was concerned about sending "sensitive information." SWICAN-9-6832.

On September 6, 2023, Cano, Salume, and former Benessere employees chatted on WhatsApp. Cano, speaking about Orlando, told the group, "Proof of employment is easy. *We need the dirt to scare the pants off of him*." Salume responded, pasting a message from Orlando, "well i'm looking for texts more like this." Cano replied, "Yes!!!! That is it." SWICAN-6-4919-21 (emphasis added). Another added, "we all had access to such critical information that could of really ruined him or exposed many things . . .." SWICAN-6-4922. Cano responded, "Team, find what you can, similar to what Natalie shared. Documents and email/WhatsApp exchanges." SWICAN-6-4922-23.

On September 7, 2023, Cano advised Salume, "Pat[rick] wants access to Box." Salume, who presumably recognized the amount of non-DWAC information in the Box Account responded, "Can you just give him access to other folder except DWAC? or what does he want to look for?" SWICAN-6-4881. The next day, Cano advised, "do not be comfortable accessing Box for him" and to "use that as leverage." SWICAN-6-4887. Salume replied, "okk" and "only if its for my benefit then." SWICAN-6-4887. Later, Cano told Salume, "you need to make sure you get your stuff first. How do you feel about getting him files from Box? . . . at least get your stuff signed. You have the power." Salume replied, "exactly yeah and then i can start getting on his good side to see if he agrees for the rest of you guys." SWICAN-6-4888.

On September 12, 2023, Salume and Cano had a private WhatsApp discussion in which Cano told Salume, "It is up to you if you want to work for Pat[rick] . . . free will)." Salume responded, "I don't." SWICAN-1-3610. Salume then sent Cano documents obtained from the Box Account. SWICAN-1-3605-70; Ex. H at Interrog. 4; *See* Mot. at Ex. A. On November 30, 2023, Swider sent an ARC II member copies of convertible notes for two other ARC II members, which Salume had

taken from the Box Account. SWICAN-9-7598; *See* Mot. at Ex. A. Both ARC II members whose convertible notes were sent in this communication became plaintiffs against ARC II. *See Edwin B. Tucker et al. v. ARC Global Ins. II, LLC et al.*, 2024-008668-CA-01 (Fla. 11th Jud. Cir. Ct. 2024).

### III. Argument

#### A.      The Motion fails on the merits.

The Motion raises five grievances: Plaintiffs allegedly (1) did not conduct an adequate presuit investigation because they did not review an activity log, (2) have inappropriately expanded the scope of the case to cover Salume's conduct, (3) are taking an inconsistent position in a counterclaim in a different case, (4) improperly retained Lawgical a year ago, and (5) did not follow the Court's supposed instructions on what to plead. Only the first of these would arguably supply a basis for a Rule 11 motion, if it were true. It's not, and neither are the other grievances.

**(1)** Defendants argue that, "notwithstanding the '407' documents alleged in the amended complaint, Plaintiffs identified only 21 documents downloaded by Defendants without authorization." Mot. at 11-12. According to Defendants, "[h]ad Plaintiffs conducted a reasonable inquiry into the claims before filing suit, they easily could have determined how many documents were accessed and which were improperly obtained." *Id.* at 11. Plaintiffs' argument focuses on this allegation:

> From March 14, 2023 to March 20, 2024, Defendant Cano intentionally and continually accessed Benessere's computer systems to obtain confidential and proprietary information in violation of 18 U.S.C. § 1030(a)(2)(C) and *accessed or downloaded* 407 files.

ECF No. 41 ¶ 100 (emphasis added). Defendants ignore the word "accessed" and the fact that the Activity Log attached to the Motion identifies 407 unique documents "accessed or downloaded," just as the Amended Complaint alleges. *See* Mot. at Ex. A. (filtering for documents accessed only by Cano from March 14, 2023 through March 20, 2024 and removing duplicates).

That Defendants admittedly downloaded 21 unauthorized files would, in any case, support this litigation. Defendants claim that because, as they see it, the documents "squarely pertain to DWAC-related business," this case cannot be maintained. Mot. at 12. They do not. But at best for Defendants, this is a factual defense to be raised at trial, and is not appropriate for a Rule 11 motion.

Factual disputes aside, in making this argument, Defendants suggest that if documents they improperly accessed or downloaded "pertain to DWAC-related business," then the law excuses their misconduct. Indeed, Defendants' Motion implicitly argues that the law is so clear on this point—that unauthorized access of a computer system is permissible if you access documents that arguably relate to a company you work for—as to render Plaintiffs' claims "objectively frivolous."

But, of course, that is not the law. "[B]eing entitled to receive information does not equate to permission to access the database." *United States v. Nosal*, 844 F.3d 1024, 1036 n.8 (9th Cir. 2016). In *Nosal*, the Ninth Circuit affirmed a criminal conviction notwithstanding the defendant argued "that he cannot be held liable because, as a contractor, he was entitled to access information from [a company] database." *Id.* Unsurprisingly, the Motion also does not cite any authority for the novel proposition that Defendants can take documents that "pertain" to DWAC as their own.

Defendants also try to win the case by claiming Plaintiffs have "conceded Defendants were authorized to access" "documents and communications that pertain and belong to Digital World Acquisition Corp." Mot. at 2. There has never been any such concession. In the argument section, Defendants elaborate on this contention, arguing that "the vast majority of the 21 [improperly accessed documents] were DWAC related documents, which even Plaintiffs' counsel has conceded Defendants had every right to access." *Id.* at 12. In support of this bold proposition, Defendants cite first to ECF No. 46 at 56:1-22, where counsel for Plaintiffs orally argued for relevance of a discovery request and noted that hypothetically "[i]t could be a breach of fiduciary

12

duty to provide one document, but it could not be a breach of fiduciary duty to provide a DWAC document to Mr. Swider, for example" during certain "timeframe[s]" and "time periods." Absurdly, Defendants seem to take this hypothetical discussion as a concession that they had a right to hack into Plaintiffs' systems and steal documents, as long as they "pertain" to DWAC. That is clearly untrue. Second, the Motion cites to ECF No. 45, 4, which does not contain any concession by Plaintiffs at all—it is a statement drafted by Defendants summarizing their interpretation comments that Judge Ruiz made in open court.

Defendants also point to an instance of Cano providing to Orlando a document that has nothing to do with DWAC to say that Plaintiffs "have no proof" that the documents were "used for some nefarious reason." Mot. at 12-13. That claim is belied by Defendants' own production. Take SWICAN-6-4887, for example, which shows that Cano instructed Salume in a WhatsApp chat to "leverage" the fact that they were denying Orlando access to the Box Account. Even if this fact did not exist, "nefarious reason" is not an element of any claim in the Amended Complaint.

Defendants also repeatedly and falsely claim that "[h]ad Plaintiffs conducted a reasonable inquiry into the claims *before filing suit*, they easily could have determined how many documents were accessed and which were improperly obtained." Mot. at 11. This action was filed on March 21, 2024, before Plaintiffs had administrative access to the Box Account on April 2, 2024. Thus, Plaintiffs could not generate an activity log until *after filing suit*. Moreover, Plaintiffs did investigate and retained a forensic team to take back control of the accounts. *See* § II.A-B., *supra*. Regardless, trial is the place to quarrel about the exact number of documents Defendants accessed or downloaded—not a Rule 11 motion. It is already undisputed that Defendants accessed and downloaded many documents without authorization. This alone defeats the Motion.

(2) Defendants claim entitlement to Rule 11 sanctions because Plaintiffs have "Attempted to

Improperly Expand the Scope of This Case Through Discovery." Mot. at 14. "The reasonable inquiry standard of Rule 11 does not preclude plaintiffs from establishing the merits of claims through discovery." *Musson v. Bradshaw Constr. Corp.*, 2013 WL 6383843, at *5 (S.D. Fla. Dec. 5, 2013); *see also* Fed. R. Civ. P. 15(b)(1). To advance the argument, Defendants focus on (1) the role of Salume and (2) damages. Without citation to evidence, Defendants assert that "Salume was Orlando's former assistant and worked and/or assisted him until late 2024." Mot. at 15. In fact, Salume stopped working for Orlando and Benessere in or around December 2022. *See* Benessere Interr. Resp. No. 3 (Ex. I). Not only was Salume not working for Plaintiffs during the relevant period, but discovery has revealed that she was actively working against Plaintiffs' interests and for Defendants' interests during this period. *See* § II.H, *supra.* Salume's betrayal was concealed until the Court compelled Defendants to produce their communications with her. Yet Defendants claim that these "are facts that Plaintiffs could, should, and would have discerned, had they conducted even a modicum of diligence before filing this frivolous and retaliatory lawsuit." Mot. at 16. In other words, now caught with their hand in the cookie jar, Defendants argue that Plaintiffs should be sanctioned for not knowing about Defendants' misdeed *before* the lawsuit was filed.

Defendants also demand sanctions because some of the information stored in the Box Account consisted of "screenshots of websites and other publicly available information that do not and cannot amount to 'confidential' information belonging to anyone, let alone Plaintiffs." Mot. at 16. While public availability of information is a defense in a trade secret case, it is not a defense to the CFAA. *E.g.*, *Maye v. United States*, 2018 WL 11244851 *21 (M.D. Fla. Feb. 16, 2018) ("[Defendant] offers no legal basis for his claim that the information he accessed must be non-public for him to have committed a crime."); *Craigslist Inc. v. 3Taps Inc.*, 964 F. Supp. 2d 1178, 1182-83 (N.D. Cal. 2013) ("Congress apparently knew how to restrict the reach of the CFAA to

only certain kinds of information, and it appreciated the public vs. nonpublic distinction—but §
1030(a)(2)(C) contains no such restrictions or modifiers.").

Similarly, Defendants excuse their unlawful self-help to the Box Account by saying that
Orlando sometimes shared documents or received documents from Defendants. But this argument,
too, misunderstands the CFAA. *Nosal*, 844 F.3d at 1036 n.8. Nor is it a defense that Defendants
separately and subsequently obtained copies of improperly accessed or downloaded documents
from third parties. Mot. at 3.

Concerning damages, Defendants claim, "Plaintiffs have expanded their claims in another way:
by interposing new and unpled damages theories." Mot. at 17. Defendants say two sets of damages
they claim are "unpled" and supposedly merit sanctions despite no showing of prejudice. "'[F]or
the first time in discovery, Plaintiffs claimed that Defendants' access to and use of the information
in the Box Account somehow 'foment[ed] litigation against ARC II for which ARC II has incurred
hundreds of thousands of dollars in legal fees and settlements.'" Mot. at 17. This feigned surprise
is exposed by the motion to dismiss briefing, where Plaintiffs explained that "[i]n the common
allegations, the Amended Complaint alleges that the lawsuits brought against ARC II by its
members and noteholders 'have cost ARC tens of thousands of dollars to defend and have required
substantial settlement payments.'" ECF No. 61 at 14 (quoting Am. Compl. ¶ 71).

This is also true concerning the profits Cano obtained. In the motion to dismiss, Plaintiffs noted
that they "also alleged that 'Cano used the ill-gotten information for his own personal gain and
profited from it while causing Benessere significant harm.'" *Id.* at 12 (quoting Am. Compl. ¶¶ 133,
141). Defendants' accusation of impropriety regarding the claims for damages related to
transactions that could not be completed due to Defendants' conduct also ignores Plaintiffs' Initial
Disclosures: "Plaintiffs have also suffered damages relating to the misuse and disclosure of

Plaintiffs' confidential and proprietary information and damages in the form of loss of client and employee goodwill and reputation, in amounts to be proven at trial" and the "ongoing" nature of damages making them "likely to increase." Ex. E. As for punitive damages, Defendants appear to fault Plaintiffs for exercising restraint in not yet alleging them.

(3) As they did in their motion to dismiss, Defendants argue that Plaintiffs assert "opposite factual theories in different fora, choosing whichever version best suits their particular case." Mot. at 18. Defendants claim the two cases "advance materially inconsistent theories of liability." *Id*. In the Sarasota County case, Plaintiffs and Orlando allege that Swider enacted the scheme to oust Orlando as CEO of DWAC in his capacity as CEO of DWAC to benefit DWAC. *See Trump Media & Tech. Grp. Corp.*, No. 2024 CA 001061, DIN 231. Here, Plaintiffs allege that Swider enacted the scheme to oust Orlando to benefit Renatus and himself. Am. Compl. ¶ 21. There is nothing sanctionable about asserting that multiple parties participated in and benefited from a conspiracy. Such is the nature of a conspiracy. *See* ECF No. 61 at 18 (elaborating on this point in opposition to Defendants' motion to dismiss). In a document produced after the Amended Complaint was filed, Swider himself said he wears "two hats in this fight. One as dwac ceo and *one as a B share holder*." SWICAN-9-8060 (emphasis added). Nor is it odd that a conspirator had multiple goals or used his control of multiple entities within the conspiracy. Even if inconsistent claims were asserted (they weren't), that would be permissible. *See* Fed. R. Civ. P. 8(d)(3); Fed. R. Civ. P. 8(d)(2) (authorizing alternative allegations). Seeking Rule 11 sanctions on this basis is frivolous.

(4) Defendants want Plaintiffs and counsel sanctioned and counsel disqualified over the retention of Lawgical, an experienced document control and computer forensic specialist. If Defendants think they have a good faith basis for disqualification (they do not), they must file a separate motion seeking that remedy. This is not a Rule 11 or 28 U.S.C. § 1927 issue. Defendants

16

offer no authority. In any event, Defendants' sole supporting averments, which are unsworn, are that *non-party* "DWAC engaged Lawgical in connection with the SEC investigation into Orlando's illegal activities" and "[t]here is no dispute that DWAC 'had a confidential relationship' with Lawgical and DWAC 'disclosed confidential information to' Lawgical." Mot. at 19-20.

The "party moving to disqualify bears the burden of *proving* the grounds for disqualification." *In re: BellSouth Corp.*, 334 F.3d 941, 961 (11th Cir. 2003) (emphasis added). That Plaintiffs and non-party DWAC purportedly used the same third-party vendor at different times and for different cases is no basis for disqualification. "Unlike attorney-client communications, discussions between parties or counsel and experts do not carry the presumption that confidential information was exchanged." *United States ex rel. Desrosiers v. Thaller*, 2016 WL 6441548, *52-53 (S.D. Fla. Nov. 1, 2016). Here, Defendants fail to provide any sworn evidence regarding the alleged confidential information or contours of the relationship (or anything else for that matter), which alone merits denial. *Daddono v. Hoffman*, 2022 WL 2802695, *12 (M.D. Fla. July 18, 2022) (denying motion to disqualify expert and refusing to assume disclosure of confidential information where movant averred "in a conclusory fashion that he shared legal theories, defenses, and the strengths and weaknesses of Plaintiff's case with" expert and movant did not seek "to provide any evidence or submissions for in camera review"); *Beyel Bros. v. Emh, Inc.*, 2022 WL 1913516, *2, 5 (S.D. Fla. Apr. 13, 2022) (same); *In re Cases*, 2021 WL 8015819, *14 (N.D. Fla. Dec. 23, 2021) (concluding mere fact of prior work "falls well short of the mark for disqualifying an expert").

Defendants could not possibly carry their burden here because not just any "confidential information" warrants disqualification, but rather information pertaining to *this* litigation: "The phrase 'confidential information' includes 'discussion of the [retaining party's] strategies in the litigation, the kinds of experts [the party] expected to retain, [the party's] views of the strengths

17

and weaknesses of each side, the role of each of the [party's] witnesses to be hired, and anticipated defenses." *Culliver v. BP Expl. & Prod.*, 2022 WL 19568967, at *11 (N.D. Fla. Oct. 13, 2022). "Technical information is not confidential." *Id.* Lawgical did not have confidential information. Its narrow function was to restore access to and control of Plaintiffs' computer systems. It could not have provided Plaintiffs with "confidential information" about this litigation, as the work for DWAC well before this litigation was nothing more than a mere data collection.

In any event, Defendants' objections are untimely and waived. Plaintiffs disclosed their retention of Lawgical in their initial disclosures approximately ten months ago. Ex. E. Defendants' tardy claim of a conflict warrants its rejection even if it were otherwise meritorious. *E.g.*, *Daddono*, 2022 WL 2802695, at *13-14 (concluding "policy and fairness weigh heavily" against disqualification because "[t]his is not a case of an expert switching sides" and "Plaintiff waited four months after learning the identity of Defendants' expert to move for his disqualification"); *Beyel Bros.*, 2022 WL 1913516, at *3 (considering movant knew "alleged conflict of interest . . . but waited until 10 days before the discovery cut off in this case to raise this issue").

**(5)** The Motion repeatedly asserts that Plaintiffs and counsel violated the Court's supposed instructions from the November 13, 2024 status conference by amending claims. Mot. at 9, 14, 17, 18. This assertion is refuted by the docket. Plaintiffs filed the Amended Complaint the night *before* the status conference. They could not have violated instructions issued during the conference on what to include in the pleading because it had already been filed. Further, while Judge Ruiz made observations to encourage the parties to consider settling, the Court had no motion before it and made no findings. *See* ECF No. 56 at 16:14-18 ("Judge Ruiz did not make any rulings that I am traveling on today. . . We are going to focus on the discovery."). Plaintiffs had leave of Court to amend and did so. Any assertion that Plaintiffs violated the Court's instructions is frivolous.

**B.      Defendants failed to comply with the procedural requirements of Rule 11.**

In any event, the Motion should be denied summarily because it was filed before the expiration of the safe harbor period. A Rule 11 motion "must not be filed or be presented to the court if the challenged paper . . . is withdrawn or appropriately corrected within 21 days." Fed. R. Civ. P. 11(c)(2); *see also Ross v. Dep't of Children & Families,* 2014 WL 12628541, at \*6-8 (M.D. Fla. May 27, 2014) (denying sanctions motion filed before the end of the safe harbor period because it "failed to comply with the mandatory procedural requirements of Rule 11"); *Fitzgerald v. McNae*, 2024 U.S. Dist. LEXIS 143857, at \*4 (S.D. Fla. Aug. 13, 2024) ("Failure to comply with Rule 11's safe harbor provision demands the denial of a Rule 11 motion."); *Star Mark Mgmt., Inc. v. Koon Chun Hing Kee Soy & Sauce Factory, Ltd.*, 682 F.3d 170, 175 (2d Cir. 2012) ("The safe-harbor provision is a strict procedural requirement."). Here, the Motion was served on March 28. The 21-day safe harbor period thus began on March 29 and ended at midnight on April 18. Fed. R. Civ. P. 6(a)(1), 6(a)(4). Defendants filed the Motion at 7:31 p.m. on April 18. Because April 18 was Good Friday, a Florida state holiday, the Motion could not have been filed until April 21. *See* Fed. R. Civ. P. 6(a)(6)(C); § 683.01(1)(i), Fla. Stat. (2025). Even if April 18 were not a holiday, the Motion could not have been filed until *after* April 18. In either event, it is untimely.

If the Motion were timely, it would nevertheless be "[p]remature at this stage of the litigation." *FCOA, LLC v. Foremost Title & Escrow Servs., LLC*, 2018 WL 624497, at \*8-10 (S.D. Fla. Jan. 30, 2018) (denying Rule 11 motion "[b]ecause [ruling on] Rule 11 sanctions should ordinarily be reserved at the end of a case"); Fed. R. Civ. P. 11 (Advis. Comm. Notes, 1983 Amend.) (noting that it is "anticipated that in the case of pleadings the sanctions issue under Rule 11 normally will be determined at the end of the litigation").

**C.      Plaintiffs should be awarded their fees.**

Rule 11 provides, in relevant part, "[i]f warranted, the court may award to the prevailing party

the reasonable expenses, including attorney's fees, incurred for the motion." Fed. R. Civ. P. 11(c)(2). If "a party files a Rule 11 motion for an improper purpose, the court may award fees to the target of the motion." *Smith v. Psychiatric Sols., Inc.*, 750 F.3d 1253, 1260 (11th Cir. 2014).

Plaintiffs do not lightly ask for fees. Plaintiffs did not seek fees incurred in connection with the multiple meritorious discovery disputes in this case. But fees are warranted here under both Rule 11, *see, e.g., Great Lakes Reinsurance (UK) PLC v. Blue Sea, LLC*, 2006 WL 2471522, *12-14 (M.D. Fla. Aug. 24, 2006) (awarding attorneys' fees for "completely unsubstantiated" motion), and 28 U.S.C. § 1927. "Under the plain statutory language, objectionable conduct—even 'unreasonable and vexatious' conduct—is not sanctionable unless it results in proceedings that would not have been conducted otherwise." *Peterson v. BMI Refractories*, 124 F.3d 1386, 1396 (11th Cir. 1997). The Motion presents a clear example of multiplying the proceedings as it "results in proceedings that would not have been conducted otherwise," as a motion to dismiss with overlapping arguments remains pending, Local Rule 56.1(e) limits parties to one summary judgment motion, and the Motion raises a multitude of factual issues which must be determined at trial. *See* 28 U.S.C. § 1927. The Motion is merely a litigation tactic, full of complaints and exaggerations about ordinary litigation disputes and the timing of Plaintiffs' discovery of Defendants' admitted wrongdoing. The Court should award the attorneys' fees Plaintiff incurred in responding.

### IV. Conclusion

Defendants cannot avoid this judicial process through an ill-considered sanctions motion that seeks to abruptly terminate their liability, which arises so clearly from facts already established before document production is complete or depositions have even begun. They were wrong to try.

Date: May 1, 2025

Respectfully submitted:

Attorneys for Plaintiffs
1200 Four Seasons Tower
1441 Brickell Avenue
Miami Florida 33131
Phone: (305) 350-5194
Fax: (305) 372-2738

By:   */s/ Antonio M. Hernandez, Jr.*

Kevin P. Jacobs, Esq.
Email: kjacobs@homerbonner.com
Florida Bar No. 169821
Jose A. Ortiz, Esq.
Email: jortiz@homerbonner.com
Florida Bar No. 182321
Charles Brumby, Esq.
Email: cbrumby@homerbonner.com
Florida Bar No. 0084054
Antonio M. Hernandez, Jr., Esq.
Email: ahernandez@homerbonner.com
Florida Bar No. 117756
Sabrina M. Serber, Esq.
Email: sserber@homerbonner.com
Florida Bar No. 1058312