## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 24-CV-21104-RAR

**BENESSERE INVESTMENT
GROUP, LLC**, *et al.*,

      Plaintiffs,

v.

**ERIC SWIDER**, *et al.*,

      Defendants.

_____/

### ORDER GRANTING IN PART DEFENDANTS' MOTION TO DISMISS

**THIS CAUSE** is before the Court upon Defendants' Motion to Dismiss Plaintiffs' Amended Complaint ("Motion"), [ECF No. 60]. The Court has reviewed the Motion; Plaintiffs' Amended Complaint ("Amended Complaint"), [ECF No. 41]; Plaintiffs' Response in Opposition to the Motion ("Response"), [ECF No. 61]; and Defendants' Reply in Support of the Motion ("Reply"), [ECF No. 62]. For the reasons discussed below, it is hereby

**ORDERED AND ADJUDGED** that Defendants' Motion to Dismiss, [ECF No. 60], is **GRANTED IN PART** as explained herein.

### BACKGROUND

Plaintiffs Benessere Investment Group ("Benessere") and ARC Global Investments II, LLC ("ARC II") bring this thirteen-count Amended Complaint under federal and Florida state law against Defendants Eric Swider, Alexander Cano, and Renatus Advisors, LLC ("Renatus"). The facts underlying the Amended Complaint center around Digital World Acquisition Corporation ("DWAC"), a publicly-traded Special Purpose Acquisition Company ("SPAC"), that was poised to merge with Trump Media & Technology Group Corp. ("Trump Media") at the time Plaintiffs brought this action. Plaintiffs allege that Defendants engaged in a computer hacking scheme aimed

at executing a "coup d'état" to gain control of DWAC and, by extension, Trump Media. *See* Am. Compl., [ECF No. 41] ¶¶ 19–20.

This is Defendants' second Motion to Dismiss in this case. *See* Defs.' Mot. to Dismiss, [ECF No. 19] (seeking to dismiss Plaintiffs' original Complaint). The facts are largely the same as before. *See generally* Order Granting in Part Defs.' Mot. to Dismiss ("Order"), [ECF No. 35]. DWAC was formed as a Special Purpose Acquisition Company ("SPAC") in December 2020. Am. Compl. ¶ 11. DWAC's sponsor is ARC II, which owns approximately 19% of the interest in DWAC and "maintains a group of investors who . . . provided the seed money to enable DWAC to become publicly traded." *Id.* ¶¶ 14–15. Patrick Orlando, who is not a party to this case, is the managing member of ARC II and also substantially owns and manages Benessere. *Id.* ¶ 3–4. Benessere provides consulting services to ARC II. *Id.* ¶ 26. Orlando previously served as DWAC's Chairman and CEO prior to being removed from those positions, and he currently serves as one of DWAC's directors. *Id.* ¶¶ 16, 22. At the time Plaintiffs brought this action, DWAC had entered into a merger agreement with Trump Media, planning to merge "with and into Trump Media."[1] *Id.* ¶ 17.

Defendant Eric Swider is currently the CEO and a Director of DWAC. *Id.* ¶ 6. Swider owns and controls Defendant Renatus. *Id.* Defendant Alexander Cano served as Orlando's assistant at Benessere until January 30, 2023. *Id.* ¶ 24. Cano was the President and Secretary of DWAC prior to the merger. *Id.* ¶ 7. Cano is currently employed as a consultant by Renatus. Following his departure and after Swider became DWAC's CEO, Swider hired Cano as his

---

[1] Plaintiffs filed their original Complaint on March 21, 2024. *See* [ECF No. 1]. At the time the Complaint was filed, DWAC had already entered into a merger agreement with Trump Media on or about October 21, 2021, but had not yet consummated the transaction. *See id.* ¶¶ 6, 17. Shortly after Plaintiffs filed the Complaint, DWAC and Trump Media completed their merger, with Trump Media surviving the merger as a wholly-owned subsidiary of DWAC, which also changed its name to "Trump Media & Technology Group Corp." *Id.* ¶ 17. Because the events that form the basis of this action occurred prior to this merger, the Court refers to DWAC and Trump Media as separate entities.

personal assistant. *Id.* ¶ 27. Cano is currently the President and Secretary of DWAC and is employed as a consultant by Renatus. *Id.* ¶ 7.

Sometime in early 2023, Swider "devised a scheme to have Orlando ousted as DWAC's CEO." *Id.* ¶ 19. "[T]o gain control of ARC II and complete his takeover of the entire DWAC enterprise," Swider "enlisted the support of Cano, who had served as Orlando's assistant at Benessere until January 30, 2023." *Id.* ¶¶ 23, 24.

Swider then recruited Cano "to obtain confidential information about ARC II and its investors" by collecting information "held by Beneserre in a protected electronic storage account at Box.com" ("Box"), a website that "offers password-protected storage for computer files." *Id.* ¶¶ 23–24. The Benessere Box account stores "the lifeblood of Benessere's business, as well as that of ARC II and other entities for which Benessere provides consulting services." *Id.* ¶ 26. "ARC II did not have employees or its own equipment and instead relied upon that provided by Benessere through a leasing relationship, including but not limited to storing information on the Box Account." *Id.* Cano "had credentials to access Benessere's Box account through his Benessere email account." *Id.* ¶ 25. Swider knew that Cano had access to the Benessere Box account and promised to make Cano DWAC's President and to provide Cano with "an outsized compensation package" of DWAC stock if Cano would help Swider "monitor and access the information in the account." *Id.* ¶¶ 28–29.

After leaving Benessere, Cano used his login credentials to access the Box account. *Id.* ¶ 34. Since February 1, 2023, Cano "repeatedly accessed the Box account" to obtain confidential information regarding ARC II's "investors as well as all financial and other confidential information not only of ARC II but also of Benessere." *Id.* ¶¶ 33–35. Cano "provided all the stolen information to Swider who used it, with Cano's assistance, for his own gain and that of Renatus and to injure Plaintiffs." *Id.* ¶ 35. Cano also "seized total control of the Box [a]ccount as

the administrator," changing the credit card that Box uses to bill for the account to a card not under Orlando's control, locking Orlando out of the Box account. *Id.* ¶¶ 30, 40.  Cano granted Swider "collaborator" or "editor" access to a number of files stored in the Box account, allowing Swider to "edit, delete, upload, and download files from the Box Account." *Id.* ¶¶ 35–37.  Cano gave Swider "collaborator" access to at least two files containing access credentials to several accounts belonging to Orlando and/or Benessere, including websites and document repositories such as Quickbooks, Benessere email accounts, MailChimp, and Docusign, among others. *Id.* ¶¶ 38–39.

Swider and Cano used the information collected from the Box account to send emails to ARC II's members and investors, consisting of (1) an email on March 5, 2024, sent through Benessere's MailChimp account, attempting to convince ARC II's members to remove Orlando as ARC II's managing member; and (2) an email on March 21, 2024, sent through DocuSign, requesting that ARC II investors decide on whether to convert their convertible notes in ARC II into Trump Media shares or cash upon completion of the merger. *Id.* ¶¶ 41–46, 56.  Plaintiffs further allege that "Swider and Cano enlisted ARC II member Gregg Alper to attempt to oust Orlando," *id.* ¶ 48, including by sending messages to "other ARC II members using confidential contact information provided to him by Swider and Cano," *id.* ¶ 49, to remove Orlando from his role as Manager of ARC II and replace him with Alper, *see id.* ¶¶ 47–60.

Orlando discovered that he had been locked out of the Box account "[a]t some point in 2023." *Id.* ¶ 30.  Orlando demanded that Cano restore his access to the Box account but did not realize then that Cano was continuing to access files in the Box account. *Id.* ¶ 31.  Cano "provided Orlando access to the Box Account, albeit limited access" on December 4, 2023, at which point Orlando became aware of Cano's and Swider's access to the Box account. *Id.* ¶ 32.

On March 20, 2024, Benessere retained a computer forensics expert to investigate Cano's and Swider's access and regain control of Benessere's accounts, spending "at least $6,000 on its

computer forensics expert's efforts[.]" *Id.* ¶¶ 61–62.  With the assistance of the retained computer forensics expert, Benessere regained control over the Box account and Cano's Benessere email account on April 2, 2024. *Id.* ¶¶ 63–65, 67–68.

Plaintiffs initially brought a ten-count Complaint, alleging violation of the Federal Wire Tap Act (Count I), violation of the Florida Security of Communications Act (Count II), violation of the Federal Computer Fraud & Abuse Act (Count III), violation of the Florida Computer Abuse and Data Recovery Act (Count IV), violation of the Electronic Stored Communications Act (Count V), Tortious Interference with Business Relationships (Count VI), Tortious Interference with Contractual Relationships (Count VII), Breach of Fiduciary Duty (Count VIII), Aiding and Abetting Breach of Fiduciary Duty (Count IX), and Civil Conspiracy (Count X).  Defendants filed a Motion to Dismiss, [ECF No. 19].  The Court granted the first Motion to Dismiss in part, dismissing Counts I and II with prejudice, dismissing Counts III, IV, VI, VII, and X without prejudice, denying the Motion to Dismiss with respect to the remaining Counts, and granting Plaintiffs leave to file an Amended Complaint.  *See generally* Order.

Plaintiffs then filed a thirteen-count Amended Complaint alleging violation of the Electronic Stored Communications Act (Count I), Breach of Fiduciary Duty (Count II), Aiding and Abetting Breach of Fiduciary Duty (Count III), violation of the Federal Computer Fraud and Abuse Act (Counts IV–VI), violation of the Florida Computer Abuse and Data Recovery Act (Counts VII–IX), Tortious Interference with Business Relationships (Count X), Conversion (Counts XI–XII), and Civil Conspiracy (Count XIII).

## **LEGAL STANDARD**

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim

has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). Although a complaint need not advance "detailed factual allegation[s]," it must allege more than "labels and conclusions" and offer more than a mere recitation of the elements of a cause of action. *Twombly*, 550 U.S. at 555. "[T]he standard 'calls for enough fact to raise a reasonable expectation that discovery will reveal evidence' of the claim." *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1289 (11th Cir. 2010) (quoting *Twombly*, 550 U.S. at 556).

"[W]hen plaintiffs 'have not nudged their claims across the line from conceivable to plausible, their complaint must be dismissed.'" *Id.* (quoting *Twombly*, 550 U.S. at 570). Further, when evaluating a Rule 12(b)(6) motion to dismiss, the court must accept all well-pleaded factual allegations as true and draw all inferences in favor of the plaintiff. *Smith v. United States*, 873 F.3d 1348, 1351 (11th Cir. 2017). The "court must limit its consideration to the pleadings and exhibits attached to the pleadings." *Gubanova v. Miami Beach Owner, LLC*, No. 12-22319, 2013 WL 6229142, at *1 (S.D. Fla. Dec. 2, 2013) (citing *Chaparro v. Carnival Corp.*, 693 F.3d 1333, 1337 (11th Cir. 2012)).

## ANALYSIS

### I.  Count I: Violation of the Electronic Stored Communications Act

Count I, brought by Benessere against all Defendants, alleges that Defendants violated the Electronic Stored Communications Act ("SCA"), which, in relevant part, creates a civil cause of action against anyone who "intentionally accesses without authorization a facility through which an electronic communication service is provided . . . and thereby obtains, alters, or prevents authorized access to a wire or electronic communication while it is in electronic storage." 18 U.S.C. § 2701(a)(1); *id.* § 2707(a) (creating private cause of action). There are thus five

elements of an SCA claim: "(1) access without authorization or exceeding an authorization to access (2) a facility (3) that provides an electronic communication service (4) thereby obtaining a wire or electronic communication (5) while the communication is in electronic storage." *Trump v. Clinton*, 626 F. Supp. 3d 1264, 1316 (S.D. Fla. 2022) (cleaned up).

The Court previously found that Plaintiffs had adequately stated a claim under the SCA. [ECF No. 35] at 15–18.  Defendants now argue that "Benessere's claim for injunctive relief is moot given that, by Plaintiffs' own concession, Defendants no longer have access to these accounts."  Defendants are mistaken.

Article III of the U.S. Constitution limits the jurisdiction of federal courts to "cases" and "controversies." U.S. CONST. art. III, § 2, cl. 1.  An action runs afoul of this jurisdictional limitation "when it no longer presents a live controversy with respect to which the court can give meaningful relief." *Fla. Ass'n of Rehab. Facilities, Inc. v. Fla. Dep't of Health and Rehab. Servs.*, 225 F.3d 1208, 1216–17 (11th Cir. 2000) (quoting *Ethredge v. Hail*, 996 F.2d 1173, 1175 (11th Cir. 1993)). "If events that occur subsequent to the filing of a lawsuit or an appeal deprive the court of the ability to give the plaintiff or appellant meaningful relief, then the case is moot" and "dismissal is required because mootness is jurisdictional." *Al Najjar v. Ashcroft*, 273 F.3d 1330, 1336 (11th Cir. 2001).  Unlike standing, mootness requires the Court to "look at the events at the present time, not at the time the complaint was filed." *Dow Jones & Co. v. Kaye*, 256 F.3d 1251, 1254 (11th Cir. 2001).

Plaintiffs' request for injunctive relief pursuant to the SCA claim is not moot.  As the Amended Complaint acknowledges, Plaintiffs regained control over Benessere's Box Account and email systems on April 4, 2024, after Plaintiffs filed the initial Complaint.  *See* Am. Compl. ¶ 63. However, Plaintiffs allege that Defendants still have access to their confidential information and "have refused to date to identify all persons to whom they provided information obtained from

Benessere's Box Account and email systems." *Id.* ¶ 72.   Consistent with these allegations, Plaintiffs seek prospective injunctive relief enjoining and restraining Defendants from "accessing any of Plaintiffs' computers and information," "obtaining, directly or indirectly, any confidential, secured, and/or proprietary information belonging to Plaintiffs," and "retaining and/or using . . . any information belonging to Plaintiffs," as well as ordering Defendants to refrain "from destroying, erasing, altering, concealing, or otherwise disposing of . . . any documents or records that relate to Plaintiffs," "to immediately disgorge and return all of Plaintiffs' information," and to "turn over any computers, mobile devices, or hard drives they used for an independent forensic examination, inspection, and creation of a mirror image." *Id.* at 27–28.

Because Plaintiffs have allegedly retained the information gained from the Box Account and other sources, the Court can still offer this prospective injunctive relief.  *See Fla. Ass'n of Rehab. Facilities*, 225 F.3d at 1216–17.   Notably, unlike the original Complaint, Plaintiffs' Amended Complaint does not include a request for injunctive relief ordering Defendants to "restore control and dominion over Plaintiffs' computer systems, the Box Account, and email accounts to Plaintiffs," consistent with Plaintiffs' restored control over the Box account and email accounts. *Compare* Compl. at 20, *with* Am. Compl. at 27–28.  As such, there is "a live controversy with respect to which the court can give meaningful relief." *Fla. Ass'n of Rehab. Facilities*, 225 F.3d at 1216–17.[2]  Accordingly, the Motion is denied with respect to Count I.[3]

---

[2] Plaintiffs further argue that Count I is not moot because "Plaintiffs also may recover damages under every count, including statutory counts[.]"  Resp. at 8.  Although Plaintiffs are correct that the SCA provides for a civil damages remedy, *see* 18 U.S.C. § 2707(c), Plaintiffs do not allege that Benessere suffered damages under Count I, pleading only an entitlement to injunctive relief, *see* Am. Compl. ¶ 84.  However, because the request for injunctive relief is not moot, the Court need not address whether Benessere maintains a live action for damages against Defendants under the SCA.

[3] Defendants also half-heartedly argue that Count I is a shotgun pleading.  *See* Mot. at 7 ("Count I should also be dismissed as a shotgun pleading, that is, improperly lumping 'all Defendants' together without informing each Defendant separately of the allegations that apply to them." (citations omitted)).  However, the Court has already ruled that the SCA claim is adequately pleaded and will not reconsider that determination on a renewed Motion to Dismiss.  *See* Order at 15–18, 15 n.7.

## II. Counts II–III: Breach of Fiduciary Duty and Aiding and Abetting Breach of Fiduciary Duty

Count II, brought by Benessere against Cano, alleges that Cano breached his "implied fiduciary duties" to Benessere "after Cano no longer was engaged by Benessere." Am. Compl. ¶ 86. Count III, brought by Benessere against Swider and Renatus, alleges that Swider and Renatus are liable for aiding and abetting Cano's breach of fiduciary duty. *Id.* ¶¶ 92–96. Defendants argue that both counts should be dismissed because Benessere fails to allege that Defendant's actions proximately caused its damages. Mot. at 7–8.

Under Florida law, a claim for breach of fiduciary duty requires a plaintiff to show (1) "existence of a fiduciary duty"; (2) "a breach of that duty"; and (3) "damage proximately caused by that duty." *Brouwer v. Wyndham Vacation Resorts, Inc.*, 336 So. 3d 372, 373 (Fla. 5th DCA 2022). A claim for aiding and abetting the breach of a fiduciary duty requires a plaintiff to show (1) "a fiduciary duty on the part of a primary wrongdoer"; (2) "a breach of that fiduciary duty"; (3) "knowledge of the breach by the alleged aider and abettor"; and (4) "the aider and abettor's substantial assistance or encouragement of the wrongdoing." *Fonseca v. Taverna Imports, Inc.*, 212 So. 3d 431, 442 (Fla. 3d DCA 2017) (citations omitted).

The Court previously found that Benessere adequately pleaded breach of fiduciary duty and aiding and abetting breach of fiduciary duty in the original Complaint, *see* Order at 20–23, which is substantially identical to the Amended Complaint with regard to these claims. *Compare* Compl. ¶¶ 111–22, *with* Am. Compl. ¶¶ 85–96. As an initial matter, Defendants cannot raise on a second motion to dismiss arguments available—but not pressed—in a previous motion to dismiss. *See* FED. R. CIV. P. 12(g)(2) ("[A] party that makes a motion under this rule must not make another motion under this rule raising a defense or objection that was available to the party but omitted from its earlier motion.").

Regardless, the Court finds that Benessere has adequately pleaded damages for Counts II and III. Benessere alleges that Cano breached his fiduciary duties to Benessere by misappropriating non-public information entrusted to him and sharing it with third parties including Swider and Renatus; that Swider and Renatus assisted or encouraged Cano in breaching his fiduciary duties; and that Benessere suffered injury as a result of these actions. These actions include "damages for costs incurred by Benessere in responding to the breach," Resp. at 10. At the very least, Benessere alleges that it spent $6,000 "on its computer forensics expert's efforts to investigate Cano's and Swider's unlawful and unauthorized access and regain control of Benessere's accounts." Am. Compl. ¶ 62. Although these damages may be paltry for a federal case, they are damages nonetheless, and damages that were proximately caused by Cano's alleged breach of fiduciary duty. Accordingly, the Motion is denied with respect to Counts II and III.[4]

### III.  Counts IV–IX: Federal Computer Fraud and Abuse Act and Florida Computer Abuse and Data Recovery Act

Plaintiffs bring three Counts against Defendants under the Federal Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030, and three counts under the Florida Computer Abuse and Data Recovery Act ("CADRA"), Fla. Stat. §§ 668.801–805. *See* Am. Compl. ¶¶ 97–148.

The Court previously dismissed Plaintiffs' CFAA and CADRA claims—each presented in a single count by all Plaintiffs against all Defendants under multiple distinct provisions of the

---

[4] Plaintiffs argue in their Response that they are entitled to "disgorgement of profits as a remedy for breach of fiduciary duty" and that this is sufficient to demonstrate damages for purposes of Counts II and III. Resp. at 9 (citations omitted); *see also Bailey v. St. Louis*, 268 So. 3d 197, 202 (Fla. 2d DCA 2018) ("[D]isgorgement may be awarded even if the claimant has not sustained any loss." (citing Restatement (Third) of Restitution and Unjust Enrichment § 3, reporter's note a (Am. L. Inst. 2011))). However, Plaintiffs do not request or allege disgorgement of profits as a remedy for Counts II and III, and the Court will therefore not consider an argument made for the first time in a response to a motion to dismiss. *See Burgess v. Religious Tech. Ctr., Inc.*, 600 F. App'x 657, 665 (11th Cir. 2015) ("We repeatedly have held that plaintiffs cannot amend their complaint through a response to a motion to dismiss."); *Tsavaris v. Pfizer, Inc.*, No. 15-21826, 2016 WL 375008, at *3 (S.D. Fla. Feb. 1, 2016) ("A plaintiff, though, cannot amend the complaint in a response to a motion to dismiss, for a court's review on dismissal is limited to the four corners of the complaint.").

CFAA and CADRA—as a shotgun pleading in violation of Federal Rules of Civil Procedure 8(a) and 10(b). *See* Order at 11–14. Defendants argue that Counts IV through IX remain a shotgun pleading. The Court agrees with respect to Counts IV through VIII, but disagrees with respect to Count IX.

Federal Rule of Civil Procedure 8(a)(2) requires that a pleading contain a "short and plain statement of the claim showing that the pleader is entitled to relief." The complaint must "give the defendant fair notice of what the claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555 (citation omitted). Federal Rule of Civil Procedure 10(b) further requires that a pleading "state its claims or defenses in numbered paragraphs, each limited as far as practicable to a single set of circumstances." "Complaints that violate either Rule 8(a)(2) or Rule 10(b), or both, are often disparagingly referred to as 'shotgun pleadings.'" *Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1320 (11th Cir. 2015). The Eleventh Circuit has routinely condemned "shotgun pleadings" because they are a "waste [of] scarce judicial resources." *Vibe Micro, Inc. v. Shabanets*, 878 F.3d 1291, 1295 (11th Cir. 2018).

The Eleventh Circuit has identified "four rough types or categories of shotgun pleadings." *Weiland*, 792 F.3d at 1321. The first type are pleadings that "contain[ ] multiple counts where each count adopts the allegations of all preceding counts, causing each successive count to carry all that came before and the last count to be a combination of the entire complaint." *Id*. Second are pleadings that are "replete with conclusory, vague, and immaterial facts not obviously connected to any particular cause of action." *Id.* at 1322. The third category encompasses pleadings that do "not separat[e] into a different count each cause of action or claim for relief." *Id.* at 1323. And fourth are pleadings that "assert[ ] multiple claims against multiple defendants without specifying which of the defendants are responsible for which acts or omissions, or which of the defendants the claim is brought against." *Id.*

As the Court explained in its previous Order, Plaintiffs' previous CFAA and CADRA counts were riddled with shotgun defects.  Order at 11–15.  The CFAA count reincorporated all the allegations of the Complaint, recited the elements of three separate CFAA provisions in the same count, and also confused which Plaintiffs were alleged to be entitled to relief under the CFAA.  *Id.* at 13.  Therefore, it was "exceedingly difficult to discern which Defendant is alleged to be responsible for what action and what particular facts support each of the distinct elements of the three separate CFAA theories squeezed into Count III."  *Id.*  Plaintiffs' CADRA claims "follow[ed] the same shotgun formula as the CFAA claims, reasserting all allegations of the Complaint, . . . reciting the elements of the two separate statutory claims, . . . [and] jumbl[ing] which Defendants are allegedly responsible for the conduct at issue."  *Id.* at 14 (internal citations omitted).  The Court therefore dismissed the CFAA and CADRA claims without prejudice and granted Plaintiffs leave to amend to cure the defects in their pleading.  *See id.* at 26.

Although Plaintiffs have now separated out their claims by Plaintiff, Counts IV through VIII remain a shotgun pleading of the third kind: one that "commits the sin of not separating into a different count each cause of action or claim for relief."  *Weiland*, 792 F.3d at 1323.  Count IV, brought by Benessere against Cano, alleges that Cano violated four provisions of the CFAA: § 1030(a)(2)(C), § 1030(a)(4), § 1030(a)(5)(C), and § 1030(a)(6)(A).  Count V, brought by ARC II against Cano, alleges that Cano violated two provisions of the CFAA: § 1030(a)(2)(C) and § 1030(a)(4).  Count VI, brought by Benessere against Swider, alleges that Swider violated two provisions of the CFAA: § 1030(a)(2)(C) and § 1030(a)(4).[5]  Count VII, brought by Benessere

---

[5]  These provisions create a civil remedy against "whoever" (1) "intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains . . . information from any protected computer," § 1030(a)(2)(C); (2) "knowingly and with intent to defraud, accesses a protected computer without authorization, or exceeds authorized access, and by means of such conduct furthers the intended fraud and obtains anything of value, unless the object of the fraud and the thing obtained consists only of the use of the computer and the value of such use is not more than $5,000 in any 1-year period," § 1030(a)(4); (3) "intentionally accesses a protected computer without authorization, and as a result of such

against Cano, alleges that Cano violated two provisions of the CADRA: § 668.803(1) and § 668.803(2).  Count VIII, brought by ARC II against Cano, likewise alleges that Cano violated two provisions of the CADRA: § 668.803(1) and § 668.803(2).[6]

Moreover, Plaintiffs advance various theories of liability in the same count.  For example, Count IV alleges violations of four independent CFAA provisions based on five separate sets of facts.  *See* Am. Compl. ¶ 100 ("From March 14, 2023 to March 20, 2024, Defendant Cano intentionally and continually accessed Benessere's computer systems to obtain confidential and proprietary information in violation of 18 U.S.C. § 1030(a)(2)(C) and accessed or downloaded 407 files."); *id.*  ¶ 101 ("From January 31, 2023 onward, Defendant Cano knowingly and with intent to defraud accessed Benessere's computer systems covertly to further the intended fraud and obtain valuable property for the benefit of Defendants in violation of 18 U.S.C. § 1030(a)(4) by accessing or downloading hundreds of files."); *id.* ¶ 102 ("On May 18, 2023, Defendant Cano intentionally accessed Benessere's computer systems covertly and as a result of such conduct, caused damage and loss in violation of 18 U.S.C. § 1030(a)(5)(C) by deleting numerous Benessere user accounts, including but not limited to that of Patrick Orlando, Alexander Monje, Gerardo Miro, and Eduardo Salume."); *id.* ¶ 103 ("On September 8, 2023, Defendant Cano intentionally accessed Benessere's computer systems covertly and as a result of such conduct, caused damage and loss in violation of 18 U.S.C. § 1030(a)(5)(C) by deleting the Benessere user accounts of Natalie Salume."); *id.* ¶ 104 ("On March 21, 2023, Defendant Cano knowingly and with the intent to defraud, trafficked a

---

conduct, causes damage and loss," § 1030(a)(5)(C); and (4) "knowingly and with intent to defraud traffics . . . in any password or similar information through which a computer may be accessed without authorization if [ ] such trafficking affects interstate or foreign commerce," § 1030(a)(6)(A).

[6] These provisions create a civil remedy against anyone who "knowingly and with intent to cause harm or loss" either "[o]btains information from a protected computer without authorization and, as a result, causes harm or loss[,]" Fla. Stat. § 668.803(1), or "[c]auses the transmission of a program, code, or command to a protected computer without authorization and, as a result of the transmission, causes harm or loss[,]" *id.* § 668.803(2).

password or similar information through which a computer could be accessed without authorization in violation of 18 U.S.C. § 1030(a)(6)(A) by creating a user account for Eric Swider to access the Box Account without which Eric Swider would not have otherwise been able to access the Box Account.").

This practice clearly violates Rule 10(b), which provides that "each claim founded on a separate transaction or occurrence . . . must be stated in a separate count" if doing so "would promote clarity." FED. R. CIV. P. 10(b).  Indeed, the Court specifically identified Plaintiffs' practice of squeezing multiple independent theories of relief into a single count as one of the key flaws in the previous CFAA and CADRA claims.  *See* Order at 13–14.

The sole count to avoid this sin is Count IX, brought by Benessere against Cano, alleging that Cano violated § 668.803(1).  Defendants separately argue that Plaintiffs' CADRA claims under § 668.803(1) fail because the "scant allegation that 'Swider and Cano conspired to and did obtain information from the Box Account without authorization and, as a result, caused [Plaintiffs] harm in violation of Florida Statutes § 668.803(1)' fails to meet requisite federal pleading standards" and Plaintiffs fail to allege "harm" as defined by the CADRA.  Mot. at 12.

On this score, the Court does not agree with Defendants.  Section 668.803(1) creates a civil remedy against anyone who "knowingly and with intent to cause harm or loss . . . [o]btains information from a protected computer without authorization and, as a result, causes harm or loss." "Harm" means any "impairment" to the "integrity, access, or availability of data, programs, systems, or information."  Fla. Stat. § 668.802(4).  The Amended Complaint alleges that Swider accessed information on the Box Account, *see, e.g.*, Am. Compl. ¶¶ 36–39, 65, 68, 121, that he did so without authorization, *see, e.g.*, *id.* ¶¶ 61, 62, 73, 145, thereby causing harm, including by locking Benessere employees out of their computer systems, *id.* ¶¶ 30, 65, 102.  These allegations plainly meet the CADRA's definition of harm as an "impairment" to the "integrity, access, or

availability of data, programs, systems, or information." Fla. Stat. § 668.802(4).  Accordingly, the Court will dismiss Counts IV through VIII without prejudice—but deny the Motion with respect to Count IX.[7]

The Court notes that Plaintiffs request leave to file a second amended complaint should the Court dismiss any of Plaintiffs' claims.  *See* Resp. at 19–20.  As an initial matter, the request is procedurally improper.  As the Eleventh Circuit has repeatedly held, a request for leave to amend (1) must be made by "filing a motion" and (2) must "either set forth the substance of the proposed amendment or attach a copy of the proposed amendment."  *Long v. Satz*, 181 F.3d 1275, 1279 (11th Cir. 1999); *see also* S.D. FLA. LOC. R. 15.1 ("A party who moves to amend a pleading shall attach the original of the amendment to the motion in the manner prescribed by Section 3I(1) of the CM/ECF Administrative Procedures.").  Consequently, "where a request for leave to file an amended complaint simply is imbedded within an opposition memorandum, the issue has not been raised properly."  *Posner v. Essex Ins. Co.*, 178 F.3d 1209, 1222 (11th Cir. 1999).

But even if the Court were to consider Plaintiffs' request for leave, Plaintiffs provide absolutely no indication as to how they would further revise the Amended Complaint beyond arguing that "[i]f the Court requires additional details, Plaintiffs should be afforded the opportunity to present them."  Resp. at 20.  Because Plaintiffs have "not even attempted to show that amendment would make [their] claims viable," the Court will not grant leave to amend.  *Western Surety Co. v. Steuerwald*, 760 F. App'x 810, 815 (11th Cir. 2019).  Further, there is no requirement

---

[7] Defendants also argue that Plaintiffs' CFAA claims fail because (1) the claims are moot because Plaintiffs have regained control over the Box account and Benessere email systems; (2) Plaintiffs fail to sufficiently allege that they suffered "damage" as defined by the CFAA; and (3) Count V—ARC II's CFAA claim again Cano—fails to show an aggregated loss of at least $5,000 by ARC II, as required to maintain a civil CFAA claim.  *See* Mot. at 9–11; *see also* 18 U.S.C. §§ 1030(g) (permitting a civil action under the CFAA where the plaintiff demonstrates an aggregate "loss" of at least $5,000 in value during any one-year period (cross-referencing 18 U.S.C. § 1030 (c)(4)(A)(i))).  As to mootness, the Court has already explained that Plaintiffs' prayer for injunctive relief is not moot.  *See supra* at 7–8.  The Court need not reach Defendants' remaining CFAA arguments.

that a court must grant a counseled plaintiff more than one opportunity to amend a deficient complaint, particularly when the amendment fails to cure a pleading flaw previously identified. *Eiber Radiology, Inc. v. Toshiba Am. Med. Sys., Inc.*, 673 F. App'x 925, 930 (11th Cir. 2016) ("We have never required district courts to grant counseled plaintiffs more than one opportunity to amend a deficient complaint, nor have we concluded that dismissal with prejudice is inappropriate where a counseled plaintiff has failed to cure a deficient pleading after having been offered ample opportunity to do so."); *cf. Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1255 (11th Cir. 2008) ("Because justice does not require district courts to waste their time on hopeless cases, leave may be denied" as futile "if a proposed amendment fails to correct the deficiencies in the original complaint or otherwise fails to state a claim." (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962))).

Plaintiffs here are represented by sophisticated counsel who should have encountered little difficulty digesting the Court's previous Order or applying the most basic of the Federal Rules of Civil Procedure.  The Court clearly spelled out the pleading deficiencies in Plaintiffs' previous Complaint.  Plaintiffs have returned with an Amended Complaint that commits many of the same errors previously identified by the Court.  Plaintiffs have had two bites at the apple, and the Court sees no need to further delay proceedings by giving Plaintiffs a third.  *See Potter v. Potter*, 199 F.R.D. 550, 553 (D. Md. 2001) ("Once a court has issued its ruling, . . . that should end the matter, at least until appeal.  Were it otherwise, then there would be no conclusion to motions practice, each motion becoming nothing more than the latest installment in a potentially endless serial that would exhaust the resources of the parties and the court—not to mention its patience.").  This case has now been litigated for a year and six months.  The Court has already granted multiple extensions of pretrial deadlines and recently stayed discovery pending the disposition of this Motion.  *See* [ECF Nos. 69, 98, 109].  It is time for Plaintiffs to march forward with the Complaint they have—not the Complaint they wish they had.  *See* DONALD RUMSFELD, KNOWN AND

UNKNOWN: A MEMOIR 645 (2011) ("You go to war with the Army you have—not the Army you might want or wish to have at a later date.").  Accordingly, the Court will dismiss Counts IV, V, VI, VII, and VIII without prejudice and without leave to amend.

### IV. Count X: Tortious Interference with Business Relations

Count X, brought by ARC II against Swider, alleges that Swider tortiously interfered with ARC II's business relationships with its investors.  Am. Compl. ¶¶ 149–56.  Specifically, "Swider used the information improperly obtained from the Box Account to contact ARC II's investors in an effort to knowingly interfere with ARC II's business relationships with such investors" because these communications contain "false statements regarding whom ARC II members should communicate with, i.e., Swider, Alper, and Cano instead of Orlando who was at all times ARC II's manager." *Id.* ¶¶ 152, 153.  And "Swider caused harm to such relationships for which ARC II has suffered damages." *Id.* ¶ 154.

Under Florida law, a claim for tortious interference with business relations has four elements: (1) "the existence of a business relationship, not necessarily evidenced by an enforceable contract"; (2) "knowledge of the relationship on the part of the defendant"; (3) "an intentional and unjustified interference with that relationship by the defendant"; and (4) "damage to the plaintiff as a result of the breach of the relationship." *Kenniasty v. Bionetics Corp.*, 82 So. 3d 1071, 1074 (Fla. 5th DCA 2011) (quoting *Magre v. Charles*, 729 So. 2d 440, 443–44 (Fla. 5th DCA 1999)).

Defendants argue that ARC II fails to establish elements (3) and (4) of a claim for tortious interference because it does not identify the nature of the business relationships that Swider interfered with and fails to show damages to ARC II that resulted from the breach. *See* Mot. at 14. These arguments do not carry the day.

ARC II specifies that it has "business relationship[s] with its members and investors" and that Swider was aware of these business relationships.  Am. Compl. ¶¶ 150–51.  Swider "used the

information improperly obtained from the Box Account to contact ARC II's investors in an effort to knowingly interfere with ARC II's business relationships." *Id.* ¶ 152.  Specifically, "[u]tilizing ARC II's confidential member information stolen from the Box Account," Swider and Cano sent an email through DocuSign to ARC II's "investors and members falsely claiming that they needed to sign a document to elect to convert their convertible notes and vote in favor of the DWAC/[Trump Media] merger." Am. Compl. ¶¶ 40, 70.  However, "[t]he investors d[id] not have a convertible note with DWAC, but with ARC II." *Id.* ¶ 70.  Thus, the "noteholders, who did not have conversion rights under the terms of their contracts, were led to believe they did have such rights by Cano and Swider." *Id.* ¶ 71.  As a result, "numerous noteholders have sued ARC II seeking to have their notes converted." *Id.*  ARC II alleges that these lawsuits "have cost [it] tens of thousands of dollars to defend and have required substantial settlement payments." *Id.*  ARC II therefore sufficiently specifies both the nature of the business relationship that it alleges Swider interfered with and the nature of the damages sought for that interference.

Plaintiffs resist this conclusion.  They argue that attorneys' fees are special damages under Florida's wrongful act doctrine, and therefore must be specifically stated under Rule 9(g), which ARC II fails to do.  *See* Reply at 6.  But the Amended Complaint sufficiently alleges special damages, thereby putting Plaintiffs on notice.

Defendants are correct that attorneys' fees sought as damages for third-party litigation instigated by a defendant's tortious acts are special damages under Florida's wrongful act doctrine, *see Robbins v. McGrath*, 955 So. 2d 633, 634 (Fla. 1st DCA 2007), and that special damages "must be specifically stated," FED R. CIV. P. 9(g).  The level of specificity needed to plead special damages is a matter of federal law.  *See Mancil's Tractor Serv., Inc. v. T&iK Constr.*, LLC, No. 15-80520, 2016 WL 7486707, at *2 (S.D. Fla. Mar. 3, 2016) (finding that, in evaluating the specificity required to plead special damages, "to the extent that a Florida procedural rule conflicts

with the federal rules[,] the *Erie* doctrine requires this Court to apply the federal rule in this diversity action" (citing *Citron v. Armstrong World Indus., Inc.*, 721 F. Supp. 1259 (S.D. Fla., Oct. 4, 1989))).  "[T]he rule is designed to inform defending parties as to the nature of the damages claimed in order to avoid surprise[ ] and to inform the court of the substance of the complaint." *Lord v. Univ. of Miami*, No. 13-22500, 2022 WL 18023293, at *6 (S.D. Fla. July 26, 2022) (quoting *Great Am. Indem. Co. v. Brown*, 307 F.2d 306, 308 (5th Cir. 1962))).

"Rule 9(g) should be read as remedy-focused—a requirement that parties specify the types of 'special damage' they seek to recover." *Leavitt v. Cole*, 291 F. Supp. 2d 1338, 1344 (M.D. Fla. 2003).  Thus, most courts "take the position that allegations of special damage will be deemed sufficient for the purpose of Rule 9(g) if they are definite enough to notify the opposing party and the court of the nature of the damages and enable the preparation of a responsive pleading."  5A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1311 (4th ed.) 2025.  Moreover, even where the complaint lacks the requisite specificity to plead special damages, courts may take into account "subsequently produced discovery in determining whether any actual prejudice has resulted from a lack of specificity in the complaint" and whether the defendant is on notice of the special damages.  *Mancil's*, 2016 WL 7486707, at *2 (collecting cases).

Here, the Court has little trouble concluding that Rule 9(g) is satisfied.  First, Plaintiffs specifically state that they are entitled to attorneys' fees in the Amended Complaint.  *See* Am. Compl. at 27.  And to the extent there is any ambiguity as to whether such attorneys' fees are being sought for the third-party litigation allegedly initiated as a result of Swider's tortious interference, the record indicates that Defendants have had ample notice of such claims.  The parties have vigorously litigated the issue in a number of discovery conferences before the Magistrate Judge, and the issue has been raised several times in the parties' interrogatories.  *See, e.g.*, November 15,

2025 Disc. Hr'g Tr., [ECF No. 56] at 61:15–18 (counsel for Plaintiffs stating that "we have alleged that all these litigations have caused us a lot of damage.  Including we have had to pay out multiple settlements and it is our position that these litigations were not valid."); February 26, 2025 Disc. Hr'g Tr., [ECF No. 75] at 20:8–11 (counsel for Defendants stating that "damages sought in connection with communications for ARC II investors is mostly for legal fees and other expenses incurred by ARC II in responding to litigation and inquiries from a specific subset of ARC II investors and members"); May 28, 2025 Disc. Hr'g Tr., [ECF No. 99] at 8:25–9:2 (counsel for Defendants stating that "[Plaintiffs have] alleged things like lost attorney fees or incurring attorneys' fees to have to defend in certain actions brought by ARC members and ARC investors.").

The Court is therefore satisfied that Defendants have sufficient notice of Plaintiffs' attorneys' fee claim for purposes of Rule 9(g).  Accordingly, the Court will deny the Motion with respect to Count X.

### V.  Counts XI–XII: Conversion

Plaintiffs bring two counts for conversion.  Count XI, brought by ARC II against Swider and Cano, alleges that Swider and Cano "locked ARC II out of its confidential business information, investor contact information, and files by removing Patrick Orlando's access to the Box Account."  Am. Compl. ¶ 158.  Count XII, brought by Benessere against Swider and Cano, similarly alleges that Swider and Cano "locked Benessere out of its Box Account and the confidential business information, credentials, investor contact information, clients lists, financial information, tax information, accounting information, privileged information, ledgers, strategies, and other protected information contained therein in removing Patrick Orlando's access to the Box Account."  *Id.* ¶ 165.

"Under Florida law, a conversion is 'an unauthorized act which deprives another of his property permanently or for an indefinite time.'" *Howard v. Gucci Am., Inc.*, No. 23-20886, 2023 WL 3750584, at *4 (S.D. Fla. June 1, 2023) (quoting *Fogade v. ENB Revocable Tr.*, 263 F.3d 1274, 1291 (11th Cir. 2001)). "[T]he elements of conversion are '(1) an act of dominion wrongfully asserted; (2) over another's property; and (3) inconsistent with his ownership therein.'" *TracFone Wireless, Inc. v. Hernandez*, 196 F. Supp. 3d 1289, 1299 (S.D. Fla. 2016). "Conversion may be demonstrated by a plaintiff's demand [for return of the property] and a defendant's refusal," *Mayo v. Allen*, 973 So. 2d 1257, 1259 (Fla. 1st DCA 2008), but "demand and refusal are unnecessary where the act complained of amounts to a conversion regardless of whether a demand is made," *Goodrich v. Malowney*, 157 So. 2d 829, 832 (Fla. 2d DCA 1963).

Swider and Cano argue that Plaintiffs fail to state a claim for conversion because (1) Plaintiffs regained control over the Box account, (2) the conversion claims are a shotgun pleading because they "improperly lump 'Swider and Cano' together without informing each Defendant separately of the allegations that apply to them," and (3) "Plaintiffs fail to identify any damages "suffered" as a result of the purported conversion." Mot at 15, 16.

Defendants' arguments fail. First, the fact that Plaintiffs regained control over the Box account does not impede their ability to maintain the conversion claims. The "essence of conversion is not the possession of property . . . but possession in conjunction with a present intent on the part of the wrongdoer to deprive the person entitled to possession of the property[.]" *Archer v. City of Winter Haven*, 846 F. App'x 759, 766 (11th Cir. 2021) (quoting *Senfeld v. Bank of Nova Scotia Tr. Co. (Cayman)*, 450 So. 2d 1157, 1160–61 (Fla. 3d DCA 1984)). Although the return of property may undermine a claim for conversion where there is no indication that the defendant "deprived [the plaintiff] of its property permanently or for an indefinite time," *Intertech Trading Corp. v. JP Morgan Chase Bank, N.A.*, No. 17-21091, 2017 WL 7792705, at *5 (S.D. Fla. Aug.

28, 2017), the return of property does not automatically destroy a conversion claim, *see, e.g.*, *Gamma Dev. Corp. v. Steinberg*, 621 So. 2d 718, 719 (Fla. 4th DCA 1993).

In any event, no such return occurred here.  Plaintiffs allege that they made "repeated demands to relinquish control over the Box Account" and Plaintiffs' confidential information stored therein, and Swider and Cano refused.  Am. Compl. ¶¶ 162, 170.  Although Cano provided Orlando with "limited access" to the Box Account on December 4, 2024, *id.* ¶ 33, Cano and Swider continued to access "and failed to relinquish access to or administrative control over the Box Account until Benessere's forensic expert regained control on April 2, 2024," *id.* ¶ 64.  Thus, there was no "return" of the Box account despite Plaintiffs' repeated demands to Swider and Cano to relinquish control over the Box account.  This is enough to state a claim for conversion.  *See Mayo*, 973 So. 2d at 1259.

Second, the fact that Plaintiffs maintain claims against both Swider and Cano does not make Counts XI and XII a shotgun pleading.  This is not a case where Plaintiffs "assert[ ] multiple claims against multiple defendants without specifying which of the defendants are responsible for which acts or omissions, or which of the defendants the claim is brought against."  *Weiland*, 792 F.3d at 1323.  Plaintiffs clearly allege that "Swider and Cano communicated about and jointly decided to remove Patrick Orlando's access to the Box Account."  Am. Compl. ¶¶ 159, 166. Moreover, the Amended Complaint has a number of allegations alleging specific actions by Swider and Cano that support the conversion claim.  *See, e.g.*, *id.* ¶ 33 ("Since February 1, 2023, at Swider's direction, Cano has improperly and without any authorization repeatedly accessed the Box Account."); *id.* ¶ 40 ("At Swider's instruction, Cano also changed the credit card on file that Box.com uses to bill for the Box Account from Orlando's card to a card belonging to Swider."); *id.* ¶ 63 ("Cano unlawfully accessed continuously and failed to relinquish control over his Benessere email accounts, including but not limited to acano@benesserecapital.com until

Benessere's forensic expert regained control on April 2, 2024."); *id.* ¶ 65 ("Swider unlawfully accessed and failed to relinquish access to the Box Account until Benessere's forensic expert regained control on April 2, 2024.").

Third, the damages argument is a red herring.  Even assuming that Plaintiffs cannot demonstrate actual damages, the failure to demonstrate actual damages does not doom a conversion claim because nominal damages are still available where the plaintiff otherwise meets the elements of conversion.  *See Grandis v. BGIS Glob. Integrated Sols. US, LLC*, No. 22-61477, 2024 WL 3301200, at *4 (S.D. Fla. Apr. 26, 2024) ("[W]here all elements of a conversion claim are present, but there are no actual damages, nominal damages are available."); *Gamma*, 621 So. 2d at 719 (holding that the trial court improperly dismissed plaintiff's conversion claim when the converted funds were returned because nominal damages were available despite the lack of actual damages); *see also King v. Saucier*, 356 So. 2d 930, 931 (Fla. 2d DCA 1978) (finding that the trial court improperly dismissed plaintiff's conversion claim for failure to prove compensatory or punitive damages because plaintiff was still entitled to "at least nominal damages" by demonstrating the elements of a conversion claim).  Accordingly, the Court will deny the Motion with respect to Counts XI and XII.

## VI.    Count XIII: Civil Conspiracy

Count XIII of the Complaint, brought by all Plaintiffs against all Defendants, alleges that Cano, Swider, and Renatus engaged in a civil conspiracy "to hack into Benessere's computer systems and use the information contained therein to have Orlando ousted as DWAC's CEO and defame Orlando." *Id.* ¶ 124.

Under Florida law, a claim of civil conspiracy requires a plaintiff to show "(1) an agreement between two or more parties; (2) to do an unlawful act or a lawful act by unlawful means; (3) the execution of some overt act in pursuance of the conspiracy; and (4) damage to the plaintiff as a

result of said acts." *Logan v. Morgan, Lewis & Bockius LLP*, 350 So. 3d 404, 412 (Fla. 2d DCA 2022). A civil conspiracy "is not a separate or independent tort[,] but is a vehicle for imputing the tortious acts of one coconspirator to another to establish joint and several liability." *Lorillard Tobacco Co. v. Alexander*, 123 So. 3d 67, 80 (Fla. 3d DCA 2013) (quotation omitted). Because Florida "does not recognize civil conspiracy as a freestanding tort," *Banco de los Trabajadores v. Cortez Moreno*, 237 So. 3d 1127, 1136 (Fla. 3d DCA 2018) (citation omitted), a plaintiff must "identify an actionable underlying tort or wrong" in order to state a claim, *Plastiquim, S.A. v. Odebrecht Constr., Inc.*, 337 So. 3d 1270, 1273 (Fla. 3d DCA 2022).

Defendants argue that Plaintiffs cannot maintain a civil conspiracy claim under the intracorporate conspiracy doctrine. Defendants are correct. The intracorporate conspiracy doctrine "provides that 'neither an agent nor an employee can conspire with his or her corporate principal or employer.'" *Mancinelli v. Davis*, 217 So. 3d 1034, 1036 (Fla. 4th DCA 2017) (quoting *Richard Bertram, Inc. v. Sterling Bank & Trust*, 820 So. 2d 963, 966 (Fla. 4th DCA 2002)). This is because "basic agency principles . . . 'attribute the acts of agents of a corporation to the corporation, so that all of their acts are considered to be those of a single legal actor.'" *Id.* (quoting *Dickerson v. Alachua Cty. Comm'n*, 200 F.3d 761, 767 (11th Cir. 2000)). This necessarily "'negat[es] the multiplicity of actors needed for a conspiracy.'" *Weisman v. S. Wine & Spirits of Am., Inc.*, 297 So. 3d 646, 652 (Fla. 4th DCA 2020) (quoting *HRCC, Ltd. v. Hard Rock Cafe Int'l (USA), Inc.*, 302 F. Supp. 3d 1319, 1325 (M.D. Fla. 2016)).

Plaintiffs respond that there was some period of time (although they do not specify when) after Cano left Benessere where he was not yet hired by Swider at Renatus. But this ignores that the intracorporate conspiracy doctrine applies not just to a corporation's employees, but also to its agents. *Mancinelli*, 217 So. 3d at 1036. As Plaintiffs themselves allege, "*all actions*" taken by Swider and Cano "were taken *on behalf of* [themselves], Renatus, and the conspiracy, among

others."  Am. Compl. ¶¶ 75–76 (emphasis added).  Plaintiffs allege that the whole point of the scheme was that Swider would "*benefit his company*, Renatus Advisors, and himself."  *Id.* ¶ 21 (emphasis added).  And "Cano provided all the stolen information to Swider who used it, *with Cano's assistance*, for his own gain *and that of Renatus* and to injure Plaintiffs."  *Id.* ¶ 35 (emphasis added).

Indeed, Plaintiffs aver that "Swider hir[ing] Cano as his assistant" and "compensate[ing] Cano through Renatus" were overt acts in furtherance of the conspiracy.  *Id.* ¶¶ 175(a), (c).  Thus, even if there was some period of time during the alleged conspiracy when Cano was not working for Renatus, the Amended Complaint establishes that Cano was, at all material times, working for the benefit and as an agent of Renatus and its owner, Swider.  *See Font v. Stanley Steemer Int'l, Inc.*, 849 So. 2d 1214, 1216 (Fla. 5th DCA 2003) ("The essential elements of an actual agency relationship are: 1) acknowledgment by the principal that the agent will act for him or her, 2) the agent's acceptance of the undertaking, and 3) control by the principal over the actions of the agent.").  The intracorporate conspiracy doctrine therefore bars Plaintiffs' civil conspiracy claim.

In a last-ditch attempt to save the civil conspiracy claim, Plaintiffs argue that the intracorporate conspiracy doctrine does not apply because they frame their claim as a conspiracy between "Cano, Swider, Renatus" and certain mysterious "others."  Resp. at 18.  In their Response, Plaintiffs reveal that one of these "others" is Gregg Alper, who was never a Renatus employee and who is alleged to have sent misleading correspondence to ARC II members.  *Id.*; *see also* Am. Compl. ¶¶ 47–60.  Even assuming that Alper was not acting as Renatus's agent, this argument fails because it is not how Plaintiffs frame their claim in the Amended Complaint.  Plaintiffs cannot, in response to a motion to dismiss, switch up their theory of the case to avoid dismissal.  *See Burgess*, 600 F. App'x at 665 ("We repeatedly have held that plaintiffs cannot amend their complaint

through a response to a motion to dismiss."). Accordingly, the Court will dismiss Count XIII without prejudice and without leave to amend. *See Eiber Radiology*, 673 F. App'x at 930.

## VII.   Liability of Renatus

Lastly, Defendants argue that Renatus is not a proper party to the two remaining counts to which it is joined: Count I for violation of the SCA and Count III for aiding and abetting breach of fiduciary duty. *See* Mot. at 18. The argument is somewhat in tension with Defendants' position that the intracorporate conspiracy doctrine applies "[g]iven that Swider and Cano are alleged to have acted on behalf of and for the benefit of Renatus." Mot. at 17. As the Court previously noted, Plaintiffs allege that Swider devised the alleged scheme "to benefit his company, Renatus," Am. Compl. ¶ 21, "Cano provided all the stolen information to Swider who used it, with Cano's assistance, for his own gain and that of Renatus and to injure Plaintiffs," *id.* ¶ 35, Swider and Cano took "all actions . . . on behalf of" Renatus, *id.* ¶¶ 75–76, and Renatus paid and employed Cano to procure his involvement in the alleged scheme, *id.* ¶¶ 27, 95. Thus, contrary to Defendants' contention, this is not a case where Plaintiffs fail to allege "any specific facts about [Renatus's] involvement." Mot. at 18 (quoting *Hendershott v. Ostuw*, No. 20-80006, 2020 WL 13111216, at *5 (S.D. Fla. Oct. 14, 2020), *aff'd*, No. 20-13991, 2022 WL 2904080 (11th Cir. July 22, 2022)). The Court is therefore satisfied that Plaintiffs have sufficiently alleged that Renatus is a proper party at the pleading stage.

## **CONCLUSION**

Based on the foregoing, it is hereby **ORDERED AND ADJUDGED** that Defendants' Motion, [ECF No. 60], is **GRANTED IN PART** as follows:

1.      Counts IV, V, VI, VII, VIII, and XIII are **DISMISSED** *without prejudice and without leave to amend*.

2.      The Motion, [ECF No. 60], is **DENIED** with respect to the remaining Counts.

3.      Defendants shall file their Answer and Affirmative Defenses to Counts I, II, III, IX, X, XI, and XII on or before **September 18, 2025**.

4.      Per the Court's Order Granting Joint Motion for Temporary Stay, [ECF No. 109], the parties shall jointly submit a proposed amended scheduling order that addresses all remaining case management deadlines—including the trial setting in this action—on or before **September 11, 2025**.

**DONE AND ORDERED** in Miami, Florida, this 4th day of September, 2025.

_____
**RODOLFO A. RUIZ II**
**UNITED STATES DISTRICT JUDGE**